## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RICARDO RODRIGUEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. |
| CHICAGO POLICE OFFICERS | ) |
| REYNALDO GUEVARA, ERNEST | ) District Judge |
| HALVORSEN, RICHARD CURLEY, | ) Magistrate Judge |
| ROBERT BIEBEL, ED MINGEY, LEE | ) |
| EPPLEN, M. SANDERS, J. MOHAN, AND | ) |
| UNKNOWN OFFICERS; and the CITY OF | ) |
| CHICAGO. | ) JURY TRIAL DEMANDED |
| | ) |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff RICARDO RODRIGUEZ, by his attorneys, LOEVY & LOEVY, complains of

Defendants REYNALDO GUEVARA, ERNEST HALVORSEN, RICHARD CURLEY,

ROBERT BIEBEL, ED MINGEY, LEE EPPLEN, M. SANDERS, J. MOHAN, UNKNOWN

CHICAGO POLICE DEPARTMENT OFFICERS, and the CITY OF CHICAGO, as follows:

### INTRODUCTION

1.     Plaintiff Ricardo Rodriguez was wrongfully convicted of the 1995 shooting death

of Rodney Kemppainen, Ricardo's friend and a person he had no reason to kill.  He was

convicted solely because Defendants conspired among themselves and others, fabricated

evidence of an "anonymous tip" connecting Rodriguez to this shooting, and coerced two people

to falsely implicate Plaintiff after both told police that Rodriguez was not the shooter.

2.     One of these eyewitnesses has now asserted that Ricardo Rodriguez is not

perpetrator and that his identification of Mr. Rodriguez was fabricated, fed to him by the

Defendant Detectives.

3.      Another witness has come forward to reveal that he witnessed the shooting and provided police with a description of the shooter that did not match Plaintiff. Defendants, however, buried that information and prevented Mr. Rodriguez from using it at trial.

4.      Defendants' conduct led to Plaintiff's wrongful conviction for murder, causing him to be sentenced to 90 years in prison.

5.      This began a decades-long odyssey for Mr. Rodriguez to clear his name, during which he spent time in the worst of Illinois prisons, including years in solitary confinement, enduring physical attacks and the constant struggle to survive what he believed might amount to a life sentence in prison.

6.      After spending over 22 years in prison for a crime he did not commit, Plaintiff was finally vindicated when, on March 27, 2018, the Circuit Court of Cook County vacated his conviction and granted the State's motion of *nolle prosequi* on all remaining charges.

7.      Everything about Ricardo Rodriguez's conviction points to a classic pattern by now-notorious Chicago Police Detectives Reynaldo Guevara and Ernest Halvorsen and their cohorts who specialized in precisely this type of misconduct. Over two decades, Defendants engaged in a disturbing succession of similar abuses, frequently preying on young Latino men in order to close unsolved cases by framing them.

8.      Defendant Guevara has universally taken the Fifth about his activities as a Chicago police officer in the face of over 100 incidents of his misconduct, asserting his right to silence on grounds that truthful responses would subject him to criminal liability.

9.      Plaintiff now brings this action to obtain justice and redress the devastating injuries that Defendants have caused him.

2

## JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants'
deprivation of Plaintiff's rights secured by the U.S. Constitution.

11.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §
1331 and supplemental jurisdiction over his state law claim for indemnification pursuant to 28
U.S.C. § 1367.

12.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial
district, the majority of the Defendants reside in this judicial district, and the events and
omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

13.     At the relevant times in this Complaint, Plaintiff Ricardo Rodriguez was a
resident of Cook County, Illinois, who spent over 22 years in prison for a crime he did not
commit.

14.     Defendant City of Chicago is an Illinois municipal corporation and is and/or was
the employer of each of the Defendant Officers.  The City of Chicago is liable for the acts of the
Defendant Officers while acting within the scope of their employment for the City.

15.     At all times relevant hereto, Defendants Reynaldo Guevara, Ernest Halvorsen,
Richard Curley, Lee Epplen, Ed Mingey, Robert Biebel, M. Sanders, J. Mohan, and other
unknown law enforcement officers (collectively, the "Defendant Officers") were police officers
in the Chicago Police Department acting under color of law and within the scope of their
employment for the City of Chicago.

16.     Defendant Lee Epplen, Robert Biebel, and Ed Mingey, at all relevant times,
supervised the Police Officer Defendants. They facilitated, condoned and approved the
constitutional violations committed by the Police Officer Defendants.

## FACTS

**Rodney Kemppainen is Killed, and Witnesses Cannot Identify The Shooter**

17.     In the early morning hours of Saturday, December 16, 1995, Rodney Kemppainen, age 38, stood outside an apartment building at the corner of Hamlin and North Avenue talking with a friend.  Although he was experiencing homelessness at the time, Mr. Kemppainen was well-known and well-liked in the neighborhood.  He did odd jobs for people and neighbors let him stay on their property.  He was not a member of a gang and had no apparent enemies.

18.     That morning he stood talking with his friend Kenneth Rudy, another man experiencing homelessness, and they shared a beer.  They were soon joined by Aurelio Martinez, a security guard who lived in the building who had been coming home from his own night of drinking.

19.     Despite the cold temperatures, they were not the only men out and about that night. Down the block, other men from the neighborhood were also sharing pizza and beer.

20.     As the men stood outside that night, a car drove down the block, shooting at the larger group of men down the block and then shooting at Mr. Kemppainen's group as well.  Mr. Kemppainen was killed.

21.     Defendants who came to the scene, including Epplen and Sanders, quickly realized that there were witnesses to the shooting who had little information to provide that would help solve this case, but also that those same witnesses could be malleable.

22.     Mr. Martinez, who had spent the night drinking before walking home, fled upstairs at the sound of the shots.  Defendants reported that Martinez told them a light blue, two door, older model Buick Regal stopped in front of the apartment building and the only occupant,

a "light complected M/WH/ 23-27 yrs" old shot through the window.  Defendants knew that Martinez was intoxicated, had little opportunity to see the shooter, and fled upstairs rather than stick around to look at the shooter.

23.    Another man around the corner on North Avenue was crossing the street to go to the liquor store around that same time.  That man, Rudolfo Zaragoza, claimed to police that as he was crossing the street he heard shots, and moments later "a light blue older GM vehicle tried to run him over."  He claimed that as he jumped out of the way the car stopped and the driver yelled obscenities that included the words "gangster killer" at him and then fired shots at him and fled on North Avenue.  There is no evidence police ever recovered any shell casings, and no physical evidence corroborating Zaragoza's claims that this encounter ever occurred.

24.    Five days after the shooting, on December 21, Defendant Richard Curley and other police officers showed Aurelio Martinez a gang book that contained photographs of members of the Spanish Cobras.  These photographs were prepared by Ed Mingey.  A photograph of Ricardo Rodriguez, whom police believed to be a Spanish Cobra, was in that book.  Martinez told Curley and others that the shooter was not in the book, although he said he was able to make an identification.

25.    Similarly, on December 18, 1995, Defendants Mason and Brennan re-interviewed Zaragoza, drove him around the neighborhood in an effort to find the shooter, and had him review photos and gang books at the police station that also included Rodriguez's photograph. Zaragoza also told Defendants that the shooter was not among those photos.

26.    Police at the scene, including Epplen and Sanders, hid exculpatory evidence.  For example, witness Ricardo Sierra, who was on the block when the shooting happened and witnessed the shooting, was known to police at the scene.  He told them that he saw what

happened and that the shooter was a dark guy with short hair, but was told by police in no uncertain terms to leave, which he did.

27.     The person Sierra saw do the shooting was a dark guy with short hair who appeared to Sierra to be Dominican, Puerto Rican, or African-American.  This description does not match Rodriguez, and police at the scene knew that their shooter did not look like Mr. Rodriguez.  Nevertheless, Defendants omitted from their reports that Sierra had given a description that did not match Mr. Rodriguez, and suppressed this exculpatory evidence from Mr. Rodriguez and his defense.

28.     Kenneth Rudy was also standing with his friend, Rodney Kemppainen, when Kemppainen was shot, and was also interviewed by police the night of the shooting.  Upon information and belief, he gave police information which was inconsistent with Ricardo Rodriguez having been the shooter  Rather than report that information, Defendants omitted from their police reports that they had spoken with him, and suppressed this exculpatory evidence from Mr. Rodriguez and his defense.

**Guevara and Halvorsen Fabricate an "Anonymous Tip" and Turn the Investigation Toward Rodriguez**

29.     The results of the initial scene investigation and conversations with the eyewitnesses left this case a whodunit.  There was no physical evidence at the scene identifying the shooter.  Witnesses did not identify the shooter from the "usual suspects" group Defendants provided to them.  The descriptions of the shooter from even the best witness, Ricardo Sierra, was still relatively basic.

30.     As became their pattern, Defendants Guevara and Halvorsen along with the other Defendants took a shooting that had little hope of being solved and pinned it on a person they disliked using false and fabricated evidence.

31.     Defendants knew Ricardo Rodriguez, who lived in the neighborhood where these Defendants regularly worked and patrolled.  In fact, Defendants knew that on December 23, 1995, Ricardo Rodriguez was arrested along with multiple other people as part of a sweep to attempt to learn information about who had shot at a woman at a payphone at a busy convenience store on Chicago's West Side.  Police in that case brought in numerous people who had been in the vicinity of the store at the time of the shooting, and Rodriguez was among them. Police were never ever to connect Rodriguez to that shooting  because Rodriguez was innocent.

32.     Rodriguez was released from custody shortly after being arrested in that case but not before Guevara and other Defendants developed a dislike of him.  While he was in custody, Detective Guevara took a polaroid picture of Rodriguez and resolved to make sure another case against Rodriguez would be more successful.  At the time Guevara took Rodriguez's photograph in lockup, he told Rodriguez words to the effect, "I've got something for you."

33.     Guevara, Halvorsen, and other Defendants then falsely claimed that Guevara and Halvorsen had received a tip or tips that Rodriguez had been the person who shot and killed Kemppainen.  Defendants fabricated this "anonymous" tip despite knowing that all of the eyewitnesses at the scene either gave a description that did not match Rodriguez, or that the eyewitnesses had actually already viewed a photograph of Rodriguez and said he was not the shooter.

**Defendants Fabricate Identifications of Ricardo Rodriguez As The Shooter**

34.     Defendants fabricated the tip so they could take Rodriguez's photograph back to the eyewitnesses they thought they could manipulate into making a false identification.

35.     On December 27, 1995, Guevara found Zaragoza on the street and showed him Rodriguez's photo and told him that this photo belonged to a person named "Casper" from the

Cobras who was already in police custody. Guevara pressured Zaragoza to identify Rodriguez as the shooter.

36. Guevara then showed Zaragoza an unduly suggestive array containing Rodriguez's photo, knowing that he would identify Rodriguez even though he was not the shooter. Guevara then falsely reported that Zaragoza had identified Rodriguez as the shooter, knowing this was false, and omitted the circumstances surrounding the identification that would have revealed the fabrication. Guevara also fed Zaragoza details of Rodriguez's appearance at the time of the shooting so that Zaragoza could later give a false description of the shooter at trial. Guevara used this manipulated, unreliable, and fabricated identification as a basis for probable cause to arrest Rodriguez.

37. The same day, Guevara and Halvorsen went to Aurelio Martinez's home. They used similar methods that they had used with Zaragoza to intimidate and manipulate Martinez into identifying Rodriguez, and then falsely reported that Martinez had made an identification. Halvorsen, perhaps recognizing that they had not been 100% successfully in persuading Martinez to make a false identification, described the identification in a police report as "tentative." Guevara, however, falsely reported that this identification had not been tentative. Again, these Defendants used this manipulated, unreliable, and fabricated identification as a basis for probable cause to arrest Rodriguez.

38. Based on this evidence, Defendants arrested Rodriguez. Guevara and Halvorsen then conducted lineups for Martinez and Zaragoza to view Mr. Rodriguez. Unsurprisingly, given everything Guevara and Halvorsen had already done to manipulate and coerce these witnesses, and because these witnesses had already seen Mr. Rodriguez's photograph and been told he was connected with this crime, they identified Mr. Rodriguez in the lineups. Defendants then used

these lineup "identifications" as evidence against Mr. Rodriguez despite knowing these
identifications were the result of a manipulated, flawed and fabricated process.

39.     At the time Rodriguez was arrested and brought to the station, Rodriguez pleaded
with the arresting officers, who were familiar with him, that Guevara and others were framing
him for a murder.  These officers did not deny to Rodriguez that he was the target of a frameup.

40.     Based on all of the misconduct by Defendants, and because of the fabricated
evidence Defendants developed against Mr. Rodriguez, Mr. Rodriguez was charged with the
murder of Rodney Kemppainen and the attempted murder of Rudolfo Zaragoza.  The only
evidence Defendants had against Ricardo Rodriguez was the evidence they had fabricated.

**Plaintiff's Trial**

41.     No inculpatory evidence other than the evidence fabricated by Defendants was
relied upon at Plaintiff's criminal trial.

42.     Mr. Zaragoza testified that he smoked a "rock" of cocaine and consumed two
beers on the night of shooting, but testified that he was no longer under the influence of drugs or
alcohol by 1:30 AM when the shooting occurred.  Around this time, as he was supposedly
walking to the liquor store, he heard shots fired and saw a two-door blue car driving up Hamlin
Avenue.  The car was driving towards him, in the dark, with its lights on.  After the car nearly
ran him over, the car stopped "for a few seconds" six to eight feet away from him.  The driver
then yelled, "Gangster killer mother-fucker" and fired two shots at him.  Mr. Zaragoza stated that
he took refuge in a near-by liquor store at this point until he was sure that the car would not
return. Zaragoza testified that Mr. Rodriguez was the person he saw in the car.  He also provided
a description of the shooter that he had not given to police at the scene, testifying that the shooter

was "Latino, with a mustache and a goatee, with a push back." This description was based on information fed to him by Defendants.

43.     Aurelio Martinez also testified at trial that the night of the shooting he had been at a bar all night, leaving at 12:15 am when a friend drove him home. He claimed he had two beers that night, drinking both around "7 or 8." He refused to identify the person he was with at the bar, testifying that it was a "friend of mine" whose name he did not remember. He said that while standing outside the apartment, someone drove up and shot at him and the group He identified the driver as Rodriguez. Martinez testified that he viewed a photo array on December 27, 1995, and he claimed that while he "recognized one" he "wasn't too sure about it." He claimed he was able to be more sure after viewing an in-person lineup.

44.     Detective Guevara also testified about the fabricated anonymous tip and provided false testimony about his interactions with Zaragoza and Martinez. He also claimed that Martinez's identification of Rodriguez after being shown the array was not tentative, and that Martinez had been sure even at that time. He said that the report identifying his identification as "tentative" was a discrepancy and that his memory was more accurate that the police report.

45.     Based on this testimony, Mr. Rodriguez was convicted of murder and attempted murder following a bench trial on March 19, 1997. He was sentenced to 90 years in prison, on the murder and attempt murder convictions, with those sentences to run consecutively.

46.     Without the Defendants' misconduct, Plaintiff would never have been prosecuted for or convicted of these charges.

47.     At the time of his trial, Defendants never disclosed to the State or to Rodriguez the exculpatory evidence they learned at the scene from Rudy and Sierra, and never disclosed the

true methods they had used to obtain these fabricated identifications and the way in which they had fed information to Zaragoza and Martinez.

## Plaintiff's Exoneration

48.     Following Mr. Rodriguez's conviction, his counsel moved for a new trial, offering a May 1997 affidavit from Mr. Zaragoza, who said, well before there was widespread knowledge about the pattern of misconduct by Guevara and Halvorsen, that his identification had been coerced.  The Court denied that motion because at that time there was no reason to disbelieve the testimony from Guevara denying that he had done anything improper in procuring these identifications.

49.     Plaintiff never stopped trying to prove his innocence.  In 2004 he filed an additional post-conviction petition raising a further affidavit from Mr. Zaragoza saying that Rodriguez was not the person who he had seen at the scene and that his identification had been coerced.  Ultimately counsel supplemented this petition to include evidence from Mr. Sierra and other evidence about the widespread misconduct that demonstrated Mr. Rodriguez's innocence.

50.     On March 27, 2018, the State requested that the Circuit Court of Cook County vacate Mr. Rodriguez's conviction.  The Court subsequently entered an order noting that Mr. Rodriguez had asserted that his constitutional rights to a fair trial and due process were violated, and that "[t]he parties agree that post-conviction relief should be granted."  On that basis, the Court vacated Mr. Rodriguez's conviction, granted the State's motion of *nolle prosequi* as to the counts in the indictment, and ordered Mr. Rodriguez released. That same day Mr. Rodriguez was released from the custody of the Illinois Department of Corrections after more than 22 years of imprisonment.

**Plaintiff's Devastating Injuries**

51.     During his over twenty-two years of wrongful imprisonment, Plaintiff was deprived of the ability to interact freely with his loved ones; to be present for holidays, births, deaths and other life events; to pursue his passions and interests; to engage in meaningful labor and develop a career; and to live freely, as an autonomous being.

52.     Instead, Plaintiff was detained in harsh, dangerous, and isolating conditions in maximum security prisons. He was branded a murderer and put in the worst of Illinois prisons, including years spent in solitary confinement.  He was subjected to physical attacks by other inmates and spent years believe that he might die in prison without ever having the opportunity to clear his name.

53.     As a result of his wrongful conviction and incarceration, Plaintiff must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for such a task.

54.     In addition to causing the severe trauma of Plaintiff's wrongful imprisonment and loss of liberty, Defendants' misconduct caused and continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

**Policy and Practice of Prosecuting Innocent Persons in Violation of Due Process**

55.     The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 70 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

56.     The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants employed against Plaintiff in this case, including: (1) fabricating "anonymous tips" to steer an investigation toward a person that police dislike; (2) procuring false witness testimony; (3) concealment of exculpatory evidence; (4) manipulation of witnesses in order to obtain false identifications; (5) manipulation of witnesses in order to influence their testimony; and (6) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

57.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to witnesses to make false witness statements and false identifications implicating innocent persons, knowing full well that those statements were false and those identifications unreliable. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable persons who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, also contrived false identifications of suspects by using suggestive identification techniques including showing witnesses the photograph of the suspect before conducting an array or lineup, telling the witness who the suspect was, giving the witness identifying information about one person in the array, threatening, coercing, or otherwise manipulating the witness to make a false identification, and/or suppressing evidence of the coercive techniques they used to obtain an identification.

13

Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced or manipulated into making a false identification or statement.

58.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, procured false testimony and identifications from witnesses knowing that testimony and/or identifications were false and would lead to the wrongful conviction of Plaintiff. The tactics and inducements used to obtain this evidence were concealed from Plaintiff.

59.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally leaving off of police reports exculpatory evidence reported to them in the course of an investigation, and by secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

60.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

61.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived

by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

62.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, manipulated, tricked, and improperly influenced the testimony of Aurelio Martinez and Rudolfo Zaragoza.

63.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

64.     Prior to and during 1996, the year in which Plaintiff was falsely charged with the killing of Rodney Kemppainen, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

65.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

66.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction,

failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

67.    Defendants Guevara, Halvorsen, and to a lesser extent Zuley, have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara and/or Halvorsen have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as they did in this case. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

68.    The City of Chicago and its Police Department failed in 1996 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.    The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

16

c. The risks associated with manipulated and suggestive identification procedures, and the proper way to conduct such procedures.

d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

e. The risks of engaging in tunnel vision during investigation.

f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

69. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

70. The City's failure to train, supervise, and discipline its officers, including repeat offenders such as Defendants Guevara, Halvorsen, and Zuley, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

71. The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

72.     The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

73.     In particular, Defendant Guevara has framed literally dozens of other innocent men over the span of two decades, men who have all lodged independent accusations of similar misconduct against him.

74.     For his part, Defendant Guevara is now refusing to testify about any of his activities as a Chicago police officer on grounds that truthful testimony would subject him to criminal liability.

75.     Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of identified cases in which Guevara has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case.

Given this extensive history, it is apparent that Guevara engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

76.     Repeatedly, Defendant Guevara has also invoked his Fifth Amendment right not to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below.

77.     Examples of Defendant Guevara's misconduct include:

a.      Bill Dorsch is a former Chicago police detective.  While serving with the Chicago police department, Dorsch was assigned to investigate a murder.  Several months after the murder occurred, Defendant Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter.  While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him."  The juvenile then agreed with Guevara, saying that was the person who committed the shooting. Dorsch then directed Defendant Guevara to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder.  Subsequently, Dorsch spoke to the two juveniles without Defendant Guevara being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.      Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

19

c.      In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez.  Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

d.      In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e.      Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.      In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

g.      In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

h.      In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

i. In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara.

j. In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

k. In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

l. In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

m. In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

n.      In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

o.      In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her.  Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

p.      In 1995, Defendant Guevara engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial.

q.      In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

r.      In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification.  Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he

changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and

Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead

detective in the case because the victim was Guevara's nephew.

        s.      In 1997, Defendant Guevara withheld physical evidence and failed to disclose the

exculpatory statements of witness Ruth Atonetty to Ariel Gomez. Gomez was accused of firing

multiple shots from a car into a crowd. Ruth Antonetty told Guevara that she heard multiple

shots coming from within the crowd, not from Gomez's vehicle. Guevara continued to pressure

her to change her account, and when she would not, he told her he "had other witnesses" and

"didn't need her." As a result, Ariel Gomez did not have access to key *Brady* material at his trial.

        t.      In 1988, Defendant Guevara used suggestive tactics to force twelve-year-old

Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin.  As a

result, Rivera was convicted of murder.  In 2011, Lopez testified at an evidentiary hearing that he

had never been able to identify Rivera as the murderer.  As a result, Rivera received a new trial.

Ultimately, the State's Attorney dropped all charges against Rivera, who was granted a

certificate of innocence.

        u.      Also during the Felix Valentin shooting investigation, Defendant Guevara falsely

claimed that the victim of that shooting identified Jacques Rivera as his shooter before he died.

Defendant Guevara claimed that the identification was made at a time that the victim was in a

medically-induced coma, unresponsive to any stimuli, and laying in a bed that was in constant

motion to prevent his lungs from filling with fluid and killing him.

        v.      In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a

trial in which Guevara was testifying and observed the testimony of trial witnesses.  She then

conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

w.      In 2011, the first district granted Tony Gonzalez a post-conviction hearing on the basis that Defendant Guevara conducted an unduly suggestive lineup wherein he concocted an array in which Gonzalez's photo was the only one that stood out from the rest in a photo array.

x.      In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

y.      In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

z.      In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned

24

a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

aa.     In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

bb.     In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

cc.     In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd.     In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and

lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

ee.     In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff.     In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

gg.     In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement, he could go home.

hh.     In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner,

Defendant Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

ii.      In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."  In the same case, Defendant Guevara similarly coerced Montanez's co-defendant Marilyn Mulero into giving a false confession, and fabricated eyewitness testimony and other evidence.

jj.      In 1993, Defendant Guevara arrested fifteen year old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

kk.      In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room.  Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away.  Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

27

ll.     In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home.  Duta complained to his father of being struck in the head and stomach by Guevara.

mm.     In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the  11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he  did not confess he would never see the light of day.  Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

nn.     In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without *Miranda* warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo.     In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

pp.     In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her  neck while she was interrogated.

qq.      In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

rr.      In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

ss.      In 1993, Detective Guevara coerced and manipulated Timothy Rankins and Francisco Vicente into providing false testimony against Jose Montanez and Armando Serrano. In 2016, the Cook County State's Attorneys' Office moved to vacate Montanez's and Serrano's convictions. Both ultimately received Certificates of Innocence.

## COUNT I – 42 U.S.C. § 1983
### Due Process: Fabrication of Evidence

78.      Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

79.      As described more fully above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by fabricating Zaragoza's and Martinez's testimonial inculpation of Plaintiff, as well as other evidence.

80.      In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Zaragoza and Martinez implicating Plaintiff in the crime that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

29

81.     Defendants' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution could not and would not have been pursued.

82.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

83.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

84.     The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below, in Count VI.

### COUNT II – 42 U.S.C. § 1983
### Due Process: *Brady* Violations

85.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

86.     As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by withholding and suppressing exculpatory evidence. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from the prosecution, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

87.     In addition, in the manner described more fully above, the Defendant Officers knowingly fabricated and solicited false evidence implicating Plaintiff in the crime; obtained

Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

88.     The Defendant Officers' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

89.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

90.     As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

91.     The misconduct described in this Count by was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III – 42 U.S.C. § 1983**
**Malicious Prosecution and Unlawful Pretrial Detention**

92.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

93.     In the manner described more fully above, the Defendant Officers individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional rights.

94.     The Defendant Officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any

31

probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

95.     In so doing, the Defendant Officers caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

96.     As a result of the Defendant Officers' false allegations and fabricated evidence, Plaintiff was seized on December 30, 1995, and remained incarcerated from that day continuing on through his trial and until his eventual exoneration.

97.     As a result of the misconduct of the Defendant Officers described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

98.     The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

99.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

100.     Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and deprive him of his constitutional rights by maliciously causing Plaintiff's prosecution, by fabricating evidence that would be used to convict Plaintiff; and by withholding exculpatory information from Plaintiff's defense and the prosecution, as described above.

101.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

102.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

103.     The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

104.     As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**COUNT V – 42 U.S.C. § 1983**
**Failure to Intervene**

105.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

106.     During the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

107.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

108.     As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

109.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT VI – 42 U.S.C. § 1983
### Municipal Liability

110.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

111.    As described more fully herein, the City of Chicago is itself liable for the violation of Plaintiff's constitutional rights. Plaintiff's injuries were caused by the policies, practices, and customs of the Chicago Police Department, in that employees and agents of the Chicago Police Department, including Defendants in particular, regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

112.    This institutional desire to close cases through abusive tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

113.    The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the Chicago Police Department, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the above-described widespread practices were allowed to flourish because the Chicago Police Department declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

114.    The constitutional violations described in this Complaint were also undertaken pursuant to the policy and practices of the Chicago Police Department in that the constitutional violations were committed with the knowledge or approval of persons with final policymaking authority for City of Chicago and the Chicago Police Department.

115.    Chicago police officers who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs.  In this way, this system proximately caused abuses, such as the misconduct at issue in this case.

116.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

### COUNT VII – State Law Claim
### Intentional Infliction of Emotional Distress

117.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

118.    In the manner described more fully above, Defendants engaged in extreme and outrageous conduct.

119.    The Defendants either intended that their conduct would cause severe emotional distress to Plaintiff or knew that there was a high probability that their conduct would cause severe emotional distress to Plaintiff.

120.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

121.     As a proximate result of this misconduct, undertaken within the scope of
Defendants' employment, Plaintiff suffered injuries, including but not limited to severe
emotional distress.

### Count VIII – State Law Claim
### Malicious Prosecution

122.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

123.     All of the individual Defendants caused Plaintiff to be improperly subjected to
judicial proceedings for which there was no probable cause. These judicial proceedings were
instituted and continued with malice and resulted in injury to Plaintiff. All such proceedings
were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

124.     The Defendants accused Plaintiff of murdering Rodney Kemppainen and
attempting to murder Rudolfo Zaragoza knowing that he was innocent of those crimes. All of the
individual Defendants fabricated evidence, manipulated the only witnesses and withheld material
exculpatory evidence. The law enforcement officer Defendants knowingly made false statements
to prosecutors with the intent of exerting influence to institute and continue judicial proceedings
against Plaintiff.

125.     The misconduct described in this Count was undertaken with malice, willfulness,
and reckless indifference to Plaintiff's rights.

126.     As a direct and proximate result of this misconduct, undertaken within the scope
of Defendants' employment, Plaintiff suffered injuries, including, but not limited to, emotional
distress, as is more fully alleged above.

## Count IX – State Law Claim
### Respondeat Superior

127.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

128.    In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all relevant times within the scope of their employment.

129.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT VI – State Law Claim
### Civil Conspiracy

130.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

131.    As described more fully in the preceding paragraphs, each of the individual Defendants acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

132.    In furtherance of the conspiracy, the Defendants each committed overt acts and were otherwise willing participants in joint activity.

133.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

134.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**Count XI – State Law Claim**
**Indemnification**

135.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

136.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

137.    The Defendant Officers are or were employees of the Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

138.    The City is liable to indemnify any compensatory judgment awarded against the Defendant Officers.

WHEREFORE, Plaintiff, RICARDO RODRIGUEZ, respectfully requests that this Court enter judgment in his favor and against Defendants, REYNALDO GUEVARA, ERNEST HALVORSEN, RICHARD CURLEY, LEE EPPLEN, ROBERT BIEBEL, ED MINGEY, M. SANDERS, J. MOHAN, UNKNOWN CHICAGO POLICE DEPARTMENT OFFICERS, and the CITY OF CHICAGO, awarding compensatory damages, costs, and attorneys' fees, as well as any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff, RICARDO RODRIGUEZ, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:


/s/ Tara Thompson
Attorney for Ricardo Rodriguez

Arthur Loevy
Jon Loevy
Russell Ainsworth
Tara Thompson
LOEVY & LOEVY
311 North Aberdeen Street
3rd Floor
Chicago, IL 60607
(312) 243-5900