# Exhibit 1



**Hot Desk**

Logged in as pc0l826

## Criminal Warrant

Cancel

### Record Details

| | | | | | |
|---|---|---|---|---|---|
| ID | 348356 | LEADS No | W19L7484 | Modified By | PC0AN99 |
| Warrant Number | CW0064675 | Send To LEADS | YES | Modified Date | 25-Oct-2019 10:36 |
| IR | 943741 | Send To NCIC | YES | Validated By | PC0AN99 |
| RD | JC376764 | Category/Caution | A - ARMED AND DANGEROUS | Validated Date | 25-Oct-2019 10:36 |
| Docket | 19111696501 | FBI | 285938MA8 | LEADS Status | ACCEPT |
| CB | | SID | IL28987780 | | LEADS Response |
| Recall | | | e.g. IL12345678 | | |
| Status | ACTIVE | Created By | PC0X422 | | |
| | | Created Date | 27-Aug-2019 23:35 | | |

### Warrant Details

| | |
|---|---|
| Val/Unit | CWU - CENTRAL WARRANT UNIT |
| Issued | 27-Aug-2019 |
| Judge | KUZAS |
| Court | 98 |
| Key | K |
| Bond | 0.0 |
| Cash | NO |
| District | 166 - FIELD SERVICES SECTION (FSS) |
| BF? | NO |

| | |
|---|---|
| Charges | 720 ILCS 5.0/10-1-A-2 |
| Charge Descr | KIDNAPPING - FORCE OR THREAT OF FORCE |
| OOC | - |
| Offense | 1002-KIDNAPPING-ADULT FOR RANSOM |
| CIL? | NO |
| GEO | |
| | EXL Help |
| EXL | 1 |
| Tmp Brd | |

### Subject Details

| | |
|---|---|
| Last Name | RODRIGUEZ |
| First Name | RICARDO |
| Middle Initial | |
| Suffix | |
| Sex | MALE |
| Race | UNKNOWN |
| DoB | 14 / Feb / 1973 |
| | DD-MON-YYYY |
| Age | 46 |
| Weight | 150 |
| Height | 511 |
| Hair | BLACK |
| Eye | BROWN |

| | |
|---|---|
| Street No | 1445 Street Dir |
| Street Name | WALNUT CREEK DR |
| Apt/Unit | |
| City | ELGIN |
| State | ILLINOIS |
| Zip | 60123 |
| Beat | |
| SOC | ▓▓▓▓▓▓ |
| FPC | |
| DLN | |
| DLY | |
| DLS | |

**JGS_RODRIGUEZ 07**

|   | Skin | MEDIUM | POB | | |
|---|------|--------|-----|---|---|
|   | Smt1 | ARM TATTOO, LEFT | | | |
|   | Smt2 | TATTOOS, NECK | | | |

## Complainant Details

| | | | |
|---|---|---|---|
| Name | CARMEN SANCHEZ/ STAUNTON 21111 | Street No | |
| Phone | | Street Name | |
| Phone Ext | | Apt/Unit | |
| Unit | 630 - DETECTIVES - AREA 3 | City | CHICAGO |
| Pax | | State | ILLINOIS |
| | | Zip | |

## Aliases

| | ID | Last Name | First Name | MI | Suffix | DOB |
|---|----|-----------|------------|----|--------|-----|
| 1 | 264611 | LOPEZ | RICARDO | R | | |
| 2 | 264610 | RODRIGUEZ | RICHARD | R | | |
| 3 | 264608 | RODRIGUEZ | RICARDO RAMON | | | |
| 4 | 264609 | RODRIQUEZ | RICHARDO | R | | |

## Miscellaneous

Misc

```
KIDNAPPING RANSOM HOME INVASION
FIREARM 720 ILCS 5 19 6A3 AGG UNLAW
FELONY RESTRAINT 720 ILCS 5 10 3 1A DOC 19
111696501 OTX 312 745 5221
```

Cancel

© Chicago Police Department 2012

**JGS_RODRIGUEZ 08**

```
M/M5MDB2YW
1001 NCIC RESPONSE
ILCPD00N9

***MESSAGE KEY QW SEARCHES WANTED PERSON FILE FELONY RECORDS REGARDLESS OF
EXTRADITION AND MISDEMEANOR RECORDS INDICATING POSSIBLE INTERSTATE
EXTRADITION FROM THE INQUIRING AGENCY'S LOCATION.  ALL OTHER NCIC PERSONS
FILES ARE SEARCHED WITHOUT LIMITATIONS.
MKE/WANTED PERSON - CAUTION
CMC/00 - ARMED AND DANGEROUS
EXL/1 - FULL EXTRADITION
ORI/ILCPD00N9 NAM/RODRIGUEZ,RICARDO SEX/M RAC/U
DOB/19730214 HGT/511 WGT/150 EYE/BRO HAI/BLK FBI/285938MA8
SKN/MED SMT/TAT L ARM
MNU/OA-943741 ████████████
OFF/KIDNAP ADULT FOR RANSOM
DOW/20190827 OCA/W19L7484
NOA/N
MIS/KIDNAPPING RANSOM HOME INVASION FIREARM 720 ILCS 5 19 6A3 AGG UNLAW FELONY
MIS/RESTRAINT 720 ILCS 5 10 3 1A DOC 19 111696501
DNA/N
ORI IS CHICAGO PD 312 745-5206
AKA/LOPEZ,RICARDO R
AKA/RODRIGUEZ,RICARDO RAMON
AKA/RODRIGUEZ,RICHARD R
AKA/RODRIQUEZ,RICHARDO R
```

```
M/M5MDB2YW
1L02 NCIC RESPONSE

NIC/W767661004 DTE/20190828  0035  EDT DLU/20190828  0038  EDT
```

**JGS_RODRIGUEZ 10**

# Exhibit 2

## Austin Rahe

| | |
|---|---|
| **From:** | David A. Brueggen <DBrueggen@jsotoslaw.com> |
| **Sent:** | Friday, December 27, 2019 12:43 PM |
| **To:** | Tara Thompson |
| **Cc:** | Josh M. Engquist; Eileen E. Rosen; Austin Rahe; Theresa B. Carney; Catherine M. Barber; Caroline P. Golden; Jim Daffada; Jeffrey R. Kivetz; Russell Ainsworth; Monica Fuentes; Diamond M. Dixon; thomas@ilesq.com |
| **Subject:** | RE: Rodriguez v. Guevara, et al., Case No. 18 CV 7951 |

Tara - We still have not received Plaintiff's answers to outstanding written discovery. Plaintiff's answers were due on or about November 14, 2019 as the parties agreed. We then received no responses to our multiple communication attempts until just last week when you said you would get us the answers on December 23, 2019. We would prefer not to delay things further because your continued delay will force us to file a motion, but we need Plaintiff's answers to written discovery to move forward with discovery and issue additional record subpoenas. We are willing to work with you on this, but need you to provide us more information about the reason(s) for the ongoing delay and when you expect that to be rectified so that we can plan accordingly.

Additionally, you never substantively responded to my emails about the proposed HIPAA/Mental Health Protective Order and FERPA release. Accordingly, to avoid further delay in obtaining records and moving forward with discovery, we will file a motion to have our proposed HIPAA/Mental Health Protective Order entered. As a reminder, our proposed order is the same one that was entered in the Sierra case and it was also recently entered in the Fulton/Coleman cases. With regard to the FERPA release, please have your client execute it and return it to our attention. We would prefer not to have to involve the Court on the FERPA release issue, but if you do not respond, you will leave us no choice but to ask the Court for its assistance.

Finally regarding your request to discuss discovery scheduling, we agree that this would be a good idea. However, any such discussion will not be efficient until after we have had an opportunity to review Plaintiff's answers to written discovery so we are fully informed and able to discuss discovery scheduling in total.

If we do not receive additional information and clarification for Plaintiff's continued delay and a reasonable date by which Plaintiff will answer written, or do not receive Plaintiff's answers to written before Monday (12/30/19) morning, we will be forced to ask the Court for assistance.

Thanks,

David A. Brueggen
(630)735-3317

This e-mail, including attachments, is covered by the ***Electronic Communications Privacy Act***, 18 U.S.C. 2510-2521. It contains information that is confidential and it may be protected by the attorney/client or other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipients. If you are not an intended recipient, please delete the e-mail, including attachments, and notify sender by mail, e-mail, or at 630-735-3300. The unauthorized use, dissemination, distribution or reproduction of this e-mail, including attachments, is prohibited and may be unlawful.

**From:** Tara Thompson <tara@loevy.com>
**Sent:** Monday, December 23, 2019 3:33 PM
**To:** David A. Brueggen <DBrueggen@jsotoslaw.com>
**Cc:** Josh M. Engquist <JEngquist@jsotoslaw.com>; Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>;

thomas@ilesq.com
**Subject:** Re: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

Hi everyone:

I'm just following up.  I apologize for the delay in finishing - I had a 7th Circuit reply due today we were finishing up and am still conferring with our client to finish.  I should be talking to him tonight and hopefully we can get everything circulated to you then.

Do you want to set up a time next week or after January 2 to confer about depositions?

Thanks,

Tara

On Wed, Dec 18, 2019 at 10:02 PM Tara Thompson <tara@loevy.com> wrote:

David:

Thanks for checking in, and I apologize for the delay in responding.  I should be able to get you both by the 23rd.

Do we want to set up a time right after the holidays to confer about depositions going forward?

Thanks,

Tara

On Tue, Dec 17, 2019 at 3:36 PM David A. Brueggen <DBrueggen@jsotoslaw.com> wrote:

Tara – we have received no response to our emails below and December 16 voice message in an effort to discuss our proposed HIPAA/Mental Health order and when Plaintiff will respond to outstanding written discovery.


We ask that you please provide us Plaintiff's answer to written discovery by December 23, 2019 to avoid the continued delay in discovery. If you are unable or unwilling to provide Plaintiff's answer to written discovery by December 23, 2019 please contact Josh Engquist or me immediately to discuss. Should we not hear from you or receive Plaintiff's responses to written discovery by December 23, 2019 we will forced to ask the Court for its assistance.


Additionally, please contact us about the proposed HIPAA/Mental Health order. If we do not hear from you by December 23, 2019, we will file a motion for entry of our proposed HIPAA/Mental Health order to avoid further delay in obtaining records.


Thank you,

David A. Brueggen

(630)735-3317

This e-mail, including attachments, is covered by the **Electronic Communications Privacy Act**, 18 U.S.C. 2510-2521. It contains information that is confidential and it may be protected by the attorney/client or other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipients. If you are not an intended recipient, please delete the e-mail, including attachments, and notify sender by mail, e-mail, or at 630-735-3300. The unauthorized use, dissemination, distribution or reproduction of this e-mail, including attachments, is prohibited and may be unlawful.

**From:** David A. Brueggen
**Sent:** Thursday, December 12, 2019 10:07 AM
**To:** Tara Thompson <tara@loevy.com>; Josh M. Engquist <JEngquist@jsotoslaw.com>
**Cc:** Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>; thomas@ilesq.com
**Subject:** RE: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

Tara – we have not received any response to the below emails regarding several discovery matters. To avoid unnecessary delays in discovery can you please advise me of your availability to discuss the following discovery issues:

- We have not received Plaintiff's answers to written discovery and need to know when you anticipate being able to provide us Plaintiff's answers to written discovery;
- Subpoenaed entities will not produce Plaintiff's medical and mental health records until we have a HIPAA/Mental Health Protective order from the Court so can you please review the previously forwarded proposed HIPAA/Mental Health Protective order and advise if you have any objection to its entry; and
- We have not received an executed copy of the FERPA release that we need to obtain Plaintiff's relevant educational records.

I look forward to discussing the above discovery issues so that we can keep discovery moving.

Thanks,

David A. Brueggen

(630)735-3317

3

This e-mail, including attachments, is covered by the *Electronic Communications Privacy Act*, 18 U.S.C. 2510-2521. It contains information that is confidential and it may be protected by the attorney/client or other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipients. If you are not an intended recipient, please delete the e-mail, including attachments, and notify sender by mail, e-mail, or at 630-735-3300. The unauthorized use, dissemination, distribution or reproduction of this e-mail, including attachments, is prohibited and may be unlawful.

**From:** David A. Brueggen
**Sent:** Thursday, December 05, 2019 9:45 AM
**To:** 'Tara Thompson' <tara@loevy.com>; Josh M. Engquist <JEngquist@jsotoslaw.com>
**Cc:** 'Eileen E. Rosen' <ERosen@rfclaw.com>; 'Austin Rahe' <arahe@rfclaw.com>; 'Theresa B. Carney' <tcarney@rfclaw.com>; 'Catherine M. Barber' <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; 'Jim Daffada' <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; 'Russell Ainsworth' <russell@loevy.com>; 'Monica Fuentes' <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>; 'thomas@ilesq.com' <thomas@ilesq.com>
**Subject:** RE: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

Tara – I wanted to follow up on the below email regarding the proposed HIPAA/MH Protective Order and FERPA release. Can you please let me know your position on those by Monday December 9 to avoid any delay in obtaining records. Several of the entities we subpoenaed for records have advised that they are unable to comply with the subpoena until they receive a HIPAA order.

Additionally, we wanted to update you on Mr. Halvorsen's medical condition that lead to his hospitalization in the beginning of November. We recently learned that Mr. Halvorsen will be undergoing surgery for his medical condition and will be under the care of a physician for some time after that. After Mr. Halvorsen is cleared by his surgeon and doctors we will provide you his answers to interrogatories. We will keep you apprised of his recovery.

Lastly, we still have not received Plaintiff's responses to our written discovery. Can you please let us know when you anticipate providing us Plaintiff's answers.

Thanks,

David A. Brueggen

(630)735-3317

This e-mail, including attachments, is covered by the *Electronic Communications Privacy Act*, 18 U.S.C. 2510-2521. It contains information that is confidential and it may be protected by the attorney/client or other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipients. If you are not an intended recipient, please delete the e-mail, including attachments, and notify sender by mail, e-mail, or at 630-735-3300. The unauthorized use, dissemination, distribution or reproduction of this e-mail, including attachments, is prohibited and may be unlawful.

**From:** David A. Brueggen
**Sent:** Monday, November 25, 2019 2:12 PM
**To:** Tara Thompson <tara@loevy.com>; Josh M. Engquist <JEngquist@jsotoslaw.com>
**Cc:** Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney
<tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>;
Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>;
Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>; thomas@ilesq.com
**Subject:** RE: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

Counsel - attached please find a FERPA release for Mr. Rodriguez to sign and have notarized so that we can subpoena
his educational records. Please have Mr. Rodriguez execute the FERPA release, have it notarized and return it to my
attention.

In addition, please find a proposed HIPAA and Mental Health protective order that is consistent with the agreed HIPAA
and Mental Health Protective order that was entered in the Montanez case. Kindly advise if you have any objection to
the entry of this protective order.

Thank you for your anticipated cooperation,

David A. Brueggen

The Sotos Law Firm, P.C.

141 W. Jackson Blvd. #1240A

Chicago, IL 60604

(630)735-3317 (Direct)

(630) 773-0980 (Fax)

This e-mail, including attachments, is covered by the *Electronic Communications Privacy Act*, 18 U.S.C. 2510-2521. It contains information that is
confidential and it may be protected by the attorney/client or other privileges. This e-mail, including attachments, constitutes non-public information intended to
be conveyed only to the designated recipients. If you are not an intended recipient, please delete the e-mail, including attachments, and notify sender by mail,
e-mail, or at 630-735-3300. The unauthorized use, dissemination, distribution or reproduction of this e-mail, including attachments, is prohibited and may be
unlawful.

**From:** Tara Thompson <tara@loevy.com>
**Sent:** Wednesday, November 13, 2019 4:55 PM
**To:** Josh M. Engquist <JEngquist@jsotoslaw.com>
**Cc:** Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>; thomas@ilesq.com
**Subject:** Re: Rodriguez v. Guevara, et al., Case No. 18 CV 7951


Everyone:


I am truly sorry for the delay, but I've had a little trouble conferring with our client to get these done, but we're close. I think one more day will do it, so we'll plan to respond tomorrow.  Again, my apologies to everyone for taking some time to get this done.


Thanks,


Tara


On Tue, Nov 12, 2019 at 10:57 AM Josh M. Engquist <JEngquist@jsotoslaw.com> wrote:

Of course … no objection from us.


Sincerely,


Josh Engquist

(630) 735-3303


**From:** Eileen E. Rosen <ERosen@rfclaw.com>
**Sent:** Tuesday, November 12, 2019 10:21 AM
**To:** Tara Thompson <tara@loevy.com>; Josh M. Engquist <JEngquist@jsotoslaw.com>
**Cc:** Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen

<DBrueggen@jsotoslaw.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>; thomas@ilesq.com
**Subject:** RE: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

If you need until tomorrow, the City has no objection.

**From:** Tara Thompson <tara@loevy.com>
**Sent:** Tuesday, November 12, 2019 10:18 AM
**To:** Josh M. Engquist <JEngquist@jsotoslaw.com>
**Cc:** Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>; thomas@ilesq.com
**Subject:** Re: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

Josh:

Thanks for the update - I appreciate it.

We are not going to be able to confer with our client to finalize our discovery responses until tonight, so it is possible we may not be able to make our submissions until tomorrow morning.  I apologize for that, but hope everyone is amenable to potentially getting ours sometime tomorrow.

Thanks,

Tara

On Mon, Nov 11, 2019 at 4:39 PM Josh M. Engquist <JEngquist@jsotoslaw.com> wrote:

   Tara:

I wanted to give you a heads up.

Mr. Halvorsen was released at the end of last week from the hospital after a lengthy stay.

He is still dealing with medical issues, so we have not been able to work with him on his discovery responses.

As I am sure you would agree, his health comes first.

By early next week, I hope to have a better idea of when he will be able to work with us in completing his responses.

Sincerely,

Josh Engquist

(630) 735-3303

---

**From:** Thomas Leinenweber <thomas@ilesq.com>
**Sent:** Thursday, November 7, 2019 4:14 PM
**To:** Josh M. Engquist <JEngquist@jsotoslaw.com>; Tara Thompson <tara@loevy.com>
**Cc:** Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>
**Subject:** RE: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

Tara – no problem Thanks, Tom

Thomas More Leinenweber

Leinenweber Baroni & Daffada, LLC

120 North LaSalle Street, Suite 2000

Chicago, Illinois 60602

(312) 606-8705

www.ilesq.com

**From:** Josh M. Engquist <JEngquist@jsotoslaw.com>
**Sent:** Thursday, November 7, 2019 4:05 PM
**To:** Tara Thompson <tara@loevy.com>
**Cc:** Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>; Thomas Leinenweber <thomas@ilesq.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>
**Subject:** RE: Rodriguez v. Guevara, et al., Case No. 18 CV 7951


Of course … I have no objection.


Sincerely,


Josh Engquist

(630) 735-3303


**From:** Tara Thompson <tara@loevy.com>
**Sent:** Thursday, November 7, 2019 3:56 PM
**To:** Josh M. Engquist <JEngquist@jsotoslaw.com>
**Cc:** Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>; Thomas Leinenweber <thomas@ilesq.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>
**Subject:** Re: Rodriguez v. Guevara, et al., Case No. 18 CV 7951


Counsel:


My paralegal has been on trial in another matter and I am still finishing up our responses to everyone's interrogatories. I know we need to get these done and moved forward, but I would appreciate a couple of additional days. Given Veterans Day is Monday, would folks object if we provided our answers by the close of business on Tuesday? We, of course, are happy to accommodate others in the same fashion.

Thanks,

Tara

On Wed, Oct 30, 2019 at 2:10 PM Josh M. Engquist <JEngquist@jsotoslaw.com> wrote:

Sounds good …

Sincerely,

Josh Engquist

(630) 735-3303

**From:** Tara Thompson <tara@loevy.com>
**Sent:** Wednesday, October 30, 2019 12:38 PM
**To:** Josh M. Engquist <JEngquist@jsotoslaw.com>
**Cc:** Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>; Thomas Leinenweber <thomas@ilesq.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>
**Subject:** Re: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

I agree - Nov. 8 for everyone makes sense, and if we can get ours done before that we'll produce them earlier.

What about having a call the week after to talk about depositions?

On Wed, Oct 30, 2019 at 12:29 PM Josh M. Engquist <JEngquist@jsotoslaw.com> wrote:

Tara-

It makes sense that everyone is on the same schedule. We are going to need the additional time to get all our discovery responses in. I hope that is agreeable.

We will be sending out the individual interog responses as we get the attestations in and not holding them until the end.

Sincerely,

Josh Engquist

(630) 735-3303

---

**From:** Eileen E. Rosen <ERosen@rfclaw.com>
**Sent:** Wednesday, October 30, 2019 9:51 AM
**To:** Tara Thompson <tara@loevy.com>
**Cc:** Josh M. Engquist <JEngquist@jsotoslaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>; Thomas Leinenweber <thomas@ilesq.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>
**Subject:** RE: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

Thanks.

**From:** Tara Thompson <tara@loevy.com>
**Sent:** Wednesday, October 30, 2019 9:43 AM
**To:** Eileen E. Rosen <ERosen@rfclaw.com>
**Cc:** Josh M. Engquist <JEngquist@jsotoslaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>; Thomas Leinenweber <thomas@ilesq.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>
**Subject:** Re: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

Eileen:

No problem. Thanks for checking in. (And congrats to Austin and his wife!)


Tara


On Wed, Oct 30, 2019, 9:37 AM Eileen E. Rosen <ERosen@rfclaw.com> wrote:

Tara –


We also need a little more time to respond to Plaintiff's discovery requests.  Austin has been working on them but his wife had the baby last night so we are a little behind. 😊 Can we also get until 11/8?


Eileen

**From:** Tara Thompson <tara@loevy.com>
**Sent:** Wednesday, October 30, 2019 9:20 AM
**To:** Josh M. Engquist <JEngquist@jsotoslaw.com>
**Cc:** Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>; Thomas Leinenweber <thomas@ilesq.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>
**Subject:** Re: Rodriguez v. Guevara, et al., Case No. 18 CV 7951


Josh:


I will check back with our team about who we have been in touch with, but I don't think we have any dates in mind for these - do you want to set up a time to confer about this?

Also, and I'll confess I don't recall the exact due date right now for Mr. Rodrigeuz's discovery responses, but we need a little additional time - would the parties object to Mr. Rodriguez providing those by November 8?


Thanks,

Tara

On Mon, Oct 28, 2019 at 12:21 PM Josh M. Engquist <JEngquist@jsotoslaw.com> wrote:

Tara-

Have you been in contact with any of the 3rd party witnesses you noticed earlier?

If so, have they indicated any potential dates for their depositions?

That way we can start working on getting them set.

Sincerely,

Josh Engquist

(630) 735-3303

**From:** Tara Thompson <tara@loevy.com>
**Sent:** Thursday, October 10, 2019 12:41 PM
**To:** Josh M. Engquist <JEngquist@jsotoslaw.com>
**Cc:** Eileen E. Rosen <ERosen@rfclaw.com>; Austin Rahe <arahe@rfclaw.com>; Theresa B. Carney <tcarney@rfclaw.com>; Catherine M. Barber <cbarber@rfclaw.com>; Caroline P. Golden <CGolden@jsotoslaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>; Thomas Leinenweber <thomas@ilesq.com>; Jim Daffada <jim@ilesq.com>; Jeffrey R. Kivetz <JKivetz@jsotoslaw.com>; Russell Ainsworth <russell@loevy.com>; Monica Fuentes <monica@loevy.com>; Diamond M. Dixon <DDixon@jsotoslaw.com>
**Subject:** Re: Rodriguez v. Guevara, et al., Case No. 18 CV 7951

Josh:

Thanks. Please provide us dates when you can and we will work on scheduling those depositions. We can also talk about dates for the third parties so we can get subpoenas out.

Best,

13

Tara

On Thu, Oct 10, 2019 at 1:13 PM Josh M. Engquist <JEngquist@jsotoslaw.com> wrote:

Counsel –

We have received your notices for the depositions of the Defendant Officers that we represent. The Defendant Officers and/or we are not available on the dates noticed.

Also, as you are aware, Mr. Curley resides in Arizona, so the scheduling of his deposition must take into consideration the necessary travel.

We will consult with our clients and provide you several dates when we are available for the depositions.

Thank you,

**Josh M. Engquist**

**The Sotos Law Firm, P.C.**

141 W. Jackson Blvd., Ste. 1240A

Chicago, IL 60604

(630) 735-3303

This email, including attachments, is covered by the *Electronic Communications Privacy Act*, 18 U.S.C. 2510-2521.  It contains information that is confidential and it may be protected by the attorney/client or other privileges.  This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipients.  If you are not an intended recipient,

please delete the e-mail, including attachments, and notify sender by mail, e-mail, or at 630-735-3300. The unauthorized use, dissemination, distribution or reproduction of this e-mail, including attachments, is prohibited and may be unlawful.

**From:** Tara Thompson [mailto:tara@loevy.com]
**Sent:** Friday, September 20, 2019 7:05 AM
**To:** Eileen E. Rosen; Austin Rahe; Theresa B. Carney; Catherine M. Barber; Jim Sotos; Josh M. Engquist; Caroline P. Golden; David A. Brueggen; Thomas Leinenweber; Jim Daffada
**Cc:** Russell Ainsworth; Monica Fuentes
**Subject:** Rodriguez v. Guevara, et al., Case No. 18 CV 7951

Counsel:

Attached please find Plaintiff's First Notice of Depositions.

Best,

Tara Thompson

_____

Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor

Chicago, Illinois 60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com

pronouns: she, her, hers

15

--

_____

Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor

Chicago, Illinois  60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com

pronouns:  she, her, hers

--

_____

Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor

Chicago, Illinois  60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com

pronouns:  she, her, hers

--

_____

Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor

Chicago, Illinois  60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com

pronouns:  she, her, hers

--

_____
Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor

Chicago, Illinois  60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com

pronouns:  she, her, hers

--

_____
Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor

Chicago, Illinois  60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com

pronouns:  she, her, hers

--

_____
Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor

Chicago, Illinois  60607
(312) 243-5900 (tel)

(312) 243-5902 (fax)
tara@loevy.com

pronouns:  she, her, hers

--
_____
Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor
Chicago, Illinois  60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com
pronouns:  she, her, hers

--
_____
Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor
Chicago, Illinois  60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com
pronouns:  she, her, hers

# Exhibit 3

```
1          STATE OF ILLINOIS  )
                              )  SS:
2          COUNTY OF C O O K  )

3
                   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
4                    COUNTY DEPARTMENT - CRIMINAL DIVISION

5
           THE PEOPLE OF THE            )
6          STATE OF ILLINOIS            )
                                        )
7                vs                     )  Case No. 96 CR 02723-01
                                        )
8          RICARDO RODRIGUEZ            )

9

10                 REPORT OF PROCEEDINGS had at the hearing in the

11         above-entitled cause, before the Honorable Leroy K.

12         Martin, Jr., Judge of said court, on the 22nd day of

13         November, A.D. 2019.

14

15         APPEARANCES:

16            MR. KWAME RAOUL
              ATTORNEY GENERAL OF ILLINOIS
17            BY:  MR. ANDREW HORVATH
                   Assistant Attorney General
18                 appeared on behalf of the People

19                 MS. TARA THOMPSON
                   MS. LAUREN MYERSCOUGH-MUELLER
20                 appeared on behalf of the Defendant

21

22
           Susan M. Sychta, CSR, CP, CM
23         Official Court Reporter
           Circuit Court of Cook County
24         Criminal Division

                              1
```

```
 1          MR. HORVATH:  Andrew Horvath for the People.

 2          MS. THOMPSON:  Tara Thompson from the Exoneration

 3     Project on behalf of Ricardo Rodriguez, your Honor.

 4          MS. MYERSCOUGH-MUELLER:  Lauren Myerscough-Mueller,

 5     M-Y-E-R-S-C-O-U-G-H-M-U-E-L-L-E-R, also from the

 6     Exoneration Project on behalf of Mr. Rodriguez.

 7          THE COURT:  All right.  What's our status?

 8          MS. THOMPSON:  I think we were here today to have

 9     the hearing on Mr. Rodriguez's certificate of innocence

10     petition.  My understanding is that both sides intend to

11     proceed merely with evidence that's already in the record

12     and to make this primarily an argument before the court.

13          THE COURT:  All right.

14          MS. THOMPSON:  And the parties are prepared to do

15     that today, your Honor.

16          MR. HORVATH:  Same with the State.

17          THE COURT:  Okay, all right.  Then if you will

18     indulge me, let me pass the matter, address some other

19     matters, and I'll bring you back a little later this

20     morning.

21                    (WHEREUPON the case was passed.)

22                             *  *  *  *

23          THE COURT:  All right.  Ladies and gentleman, again

24     for the record.
```

2

1          MS. THOMPSON:   Tara Thompson on behalf of Ricardo

2     Rodriguez from the Exoneration Project, your Honor.

3          MS. MYERSCOUGH-MUELLER:  Also, your Honor, Lauren

4     Myerscough-Mueller from the Exoneration Project on behalf

5     of Mr. Rodriguez.

6          MR. HORVATH:  Andrew Horvath for the People.

7          THE COURT:  All right.  Counsel, I want to hear from

8     you.

9          MS. THOMPSON:  Thank you, your Honor.

10              Let me just briefly explain for the court

11     how the petitioner intends to proceed today.  I want to

12     first note for the record that Mr. Rodriguez is not

13     present.  He has grandparents in California who are

14     elderly and not doing well, and so he is with his

15     grandparents in California today and could not be here.

16              He does have family members that are here

17     to hear this argument and in support of him, and he

18     understands what's occurring today and wanted it to be

19     able to proceed and can't be present.  So that is why he

20     is not here, your Honor.

21          THE COURT:  All right.

22          MS. THOMPSON:  It is the petitioner's intention for

23     Ms. Myerscough-Mueller to talk briefly about the legal

24     standard and of the issues related to Detectives Guevara

                                3

1     and Halvorsen that are relevant to this petition as well

2     as to give a brief overview from the facts that are

3     relevant to this case and relevant to the certificate,

4     and then I will talk about the remainder of the standards

5     that applies.  So we'd like to split our argument time.

6          MR. HORVATH:  Just so I don't interrupt.  I would

7     lodge an objection as to what's going to be proffered

8     regarding former Detective Reynaldo Guevara in other

9     cases because that is not testimony in this case that I

10    don't believe is supported by the statute allowing that

11    type of evidence.

12               With that said, I defer.

13         THE COURT:  All right.  I would normally tell you to

14    object at the time that that argument is mentioned so I

15    know specifically what it is that you're referencing.  I

16    think I do know what you're referencing, and I know that

17    you didn't wish to be rude and interrupt counsel, but

18    perhaps it would offer some clarity.

19         MR. HORVATH:  Certainly, Judge.

20         MS. MYERS-COUGH MULLER:  Thank you, Judge.

21               As you know, we're here on Ricardo

22    Rodriguez's certificate of petition.  Ricardo served over

23    22 years for a crime he didn't commit and he was a victim

24    of the well known pattern and practice abuse by Detective

4

1    Guevara and Detective Halvorsen.

2              But your Honor, this case is not just

3    about Guevara and his wrongdoing.  It's also about, and

4    it's the main focus of it is Ricardo's innocence.  There

5    are eyewitnesses who swear that Ricardo was not at all

6    involved.  He has an alibi, and absolutely no physical

7    evidence ever linked him to this crime in any way.

8              He is now seeking the certificate of

9    innocence from this court to begin to recover from the

10   devastating impact that this wrongful conviction had on

11   his life.  To obtain this certificate of innocence, there

12   are four things that we need to establish by a

13   preponderance of the evidence, and that's our burden.

14             First we need to establish that Ricardo

15   was convicted of a felony, he was sentenced to a term of

16   imprisonment and that he served all or part of that

17   sentence.

18             Second, we need to show that his

19   conviction was vacated or reversed and that the

20   indictment was dismissed.

21             Third, we need to show that Ricardo did

22   not voluntarily cause or bring about his conviction.

23             And fourth, that he is innocent of the

24   offenses charged in the indictment.

5

```
 1                       Now, the State does not contest three

 2      prongs of this, the statute.  The State does not contest

 3      that Ricardo was convicted of first degree murder and

 4      attempted first degree murder, both felonies, on

 5      March 19, 1997.  And he was sentenced to 90 years.  He

 6      served 22 years, two months and 22 days in prison on

 7      those charges.

 8                       The State does not contest that Ricardo's

 9      conviction was vacated by Judge Obbish on March 7, 2018,

10      and that the State then nolled the counts remaining on

11      the indictment.

12                       And the State does not contest that

13      Ricardo did not contribute in any way to his conviction

14      as he never misled authorities in any way to think that

15      he committed this offense.  He has always maintained his

16      innocence.  He never issued any sort of statement of

17      guilt or connection to the crime at all, and he, in fact,

18      was not even there.

19                       So the only argument remaining, Judge, is

20      on the innocence of Mr. Rodriguez.  The State's only

21      argument is that Ricardo is not innocent based on the

22      identification of a single eyewitness who was the product

23      of Guevara and Halvorsens corrupt investigation in this

24      case.
```

1              Detective Guevara was actually given the

2       opportunity to explain his investigation and explain this

3       identification, but instead he took the 5th amendment,

4       and I'll get into that.

5              MR. HORVATH:  Judge, at this time that's where I

6       would lodge my objection to.  I believe the argument is

7       going to be that you can take a negative influence

8       against Guevara in this case based upon his invocation of

9       his 5th amendment rights in the ancillary matter.  I

10      don't believe the law supports that.

11             Everybody knows what Guevara is going to

12      do if called before this court.  I'm not being

13      duplicitous, but there is that issue.

14             THE COURT:  Well, let me ask you this question.  You

15      referenced this testimony being given at a deposition in

16      an ancillary matter?

17             MR. HORVATH:  Yes, sir.

18             THE COURT:  Were the questions to which, the

19      questions that were posed to Mr. Guevara that we're

20      talking about now, were those questions related to this

21      matter?

22             MR. HORVATH:  They were, Judge.

23             THE COURT:  All right.  So then that does not change

24      your opinion, you believe, because the proceedings were

```
 1      ancillary, but questions regarding this specific matter,

 2      that that makes them irrelevant or not appropriate?

 3          MR. HORVATH:  I do, Judge.  And again, I'm not being

 4      duplicitous.  I understand that if they were to subpoena

 5      Mr. Guevara, I fully anticipate that he would have

 6      invoked his 5th amendment right in this proceeding.

 7                And I'm not trying to play games here.  My

 8      objection is that a lot of what Guevara had to say in

 9      other cases, even about other cases not detailing the

10      allegations of Ricardo Rodriguez, just for instance,

11      Judge, just two weeks ago in a case -- and you can take

12      judicial notice of this if you wish -- a case called Jose

13      Maisonette, in fact the petitioner was just served before

14      this court.  Mr. Greenberg came in last week on a

15      petition.

16                Now, Mr. Guevara was asked questions about

17      whether he provided underaged girls to the petitioner,

18      Mr. Maisonette, for some kind of child sex ring for which

19      he took the 5th amendment to virtually everything.  So I

20      don't think that these type of ancillary proceedings,

21      that that should be used as a negative inference against

22      the State.  He is not the State, he is a witness.

23          THE COURT:  All right.  Thank you.

24          MS. THOMPSON:  I want to be clear about one
```

```
1       procedural issue, and I interject because I think I have

2       some knowledge about the history of the case that frankly

3       Mr. Myerscough-Mueller or Mr. Horvath doesn't have, which

4       is that we did subpoena Mr. Guevara in this case.  And if

5       the court recalls, there was an agreement, and this did

6       predate Mr. Horvath with the State, that in lieu of

7       seeking a separate deposition of Mr. Guevara about Mr.

8       Rodriguez's case, we would instead ask the questions that

9       we had of him for these proceedings in a deposition in

10      another matter that was going to occur in Texas where Mr.

11      Guevara resides.

12              And so the taking of the 5th that Ms.

13      Myerscough-Mueller refers to is for all intents and

14      purposes a deposition that occurred with the agreement of

15      the State that would involve Mr. Rodriguez's case.

16              And I understand the point which the court

17      is making that that probably doesn't even matter, but it

18      was the State's understanding that he was going to be

19      posed questions at that time in lieu of seeking a

20      separate deposition.  That is what Ms. Myerscough-Mueller

21      is referring to.

22              Thank you, Judge.

23      MS. MYERSCOUGH-MUELLER:  So there is the single

24      eyewitness, like I said, that was the product of
```

9

1    Guevara's corrupt investigation.  The single eyewitness

2    does not outweigh the two eyewitnesss that I'm going to

3    talk about who swear that Ricardo was not involved, does

4    not outweigh any absence, the absence of any physical

5    evidence, and the pattern and practice of misconduct that

6    has been proven that Halvorsen and Guevara undertook in a

7    number of cases including in this case.

8                So your Honor, I want to give a brief

9    background of the facts in this case to kind of put

10   everything in context.  So this case involved a shooting,

11   and Rodney Kemppainen, and that's K-E-M-P-P-A-I-N-E-N, he

12   was shot and killed in an apparent drive-by on

13   December 16, 1995.  That was in the early morning hours,

14   it was dark outside, and while he was standing on a

15   corner with Kenneth Rudy and Aurelio Martinez.  There was

16   drinking involved by many at the scene that night, and

17   we'll explain why that matters in a little bit.

18                So then as the car sped away, it slowed to

19   supposedly shoot at Rudolfo Zaragoza who survived and was

20   another eyewitness in this matter.

21                Detectives Guevara and Halvorsen then

22   picked up the case.  There was a statement at the scene

23   by Kenneth Rudy who was one of the men who was there that

24   day who said that he was not going to be able to identify

10

1    anyone, that the muzzle flashes from the car obscured his

2    view to be able to see the person's face.

3                        So Detective Guevara and Halvorsen had

4    both Zaragoza and Martinez view gang books.  Neither of

5    them made any identification from those gang books, but

6    we have every reason to believe that Ricardo's photo was

7    in those gang books because the police believed him to be

8    a gang member.

9                        With no leads at that point, the

10   detectives claim that they got an anonymous tip that

11   Ricardo was responsible; however, the account of those

12   tips are inconsistent.  One time they said it came from a

13   gang informant who claimed he was present when Ricardo

14   was bragging about the crime, and in another report they

15   said that that anonymous tip was actually a phone call

16   where someone asked whether Casper, which was a nickname

17   of Ricardo, was under arrest for this murder.

18                       So the detectives based on this alleged

19   anonymous tip had Zaragoza and Martinez view photo arrays

20   and line-ups, and then the two allegedly identified

21   Ricardo at the line-up.

22                       So based on only these two eyewitnesses

23   and Detective Guevara, Ricardo was convicted of the first

24   degree murder and the attempted first degree murder of

1          Zaragoza, and he was sentenced to 90 years.

2                    But then as soon as the conviction

3          happened, the case began to unravel immediately.  The

4          eyewitness, Zaragoza, came forward and swore an affidavit

5          pretty immediately after the trial in 1997 that he

6          actually wasn't sure about his identification and that

7          Detective Guevara pointed Ricardo out to him as the

8          perpetrator.

9               MR. HORVATH:  I'd object to that.  That misstates

10         the evidence.

11              MS. MYERSCOUGH-MUELLER:  Your Honor, there is a --

12         there are two affidavits from Zaragoza in this case that

13         I'm getting into.  The first one is from 1997 where he

14         said he goes back and forth -- and I have a copy of that.

15         He had been tossing and turning at night because he --

16              THE COURT:  So State, are you -- when you say it

17         misstates the evidence, are you saying that counsel is

18         mischaracterizing the affidavit from Zaragoza?

19              MR. HORVATH:  Yes, Judge, and I'll get into that.

20         Again, we have a procedure here and that's fine.

21              THE COURT:   All right.

22              MS. THOMPSON:  So then in 2002, Zaragoza recanted

23         his entire testimony in the second affidavit saying he

24         was 100 percent certain that Ricardo was not the shooter,

1       and he was pressured by Guevara and Halvorsen.

2                     Many years later during the post

3       conviction investigation, another eyewitness came forward

4       who there was no record of prior to that, and this was

5       Ricardo Sierra.  There is also an affidavit of that in

6       the record for your Honor.

7                     Ricardo Sierra provided this affidavit

8       swearing that he was there when the shooting happened.

9       He had a good viewpoint across the corner of the shooting

10      and knew for certain that Ricardo was not the shooter.

11      He actually tried to tell police what he saw that night,

12      but they would not listen to him, that they told him to

13      go away or he would be locked up.  So he didn't make a

14      formal statement to police, but they knew of him.

15                    This is a man, your Honor, who had no

16      reason to lie.  He was friends of the victim, rival gang

17      from Mr. Rodriguez, and that actually explains why he

18      hadn't come forward before.

19                    Your Honor, also during this time for the

20      post conviction investigation, the pattern and practice

21      of abuse and misconduct by Detective Guevara and

22      Halvorsen is now well known by this court and the State

23      as well came to light as more details emerged all the

24      time as to what these detectives were doing in these

13

1    cases that they were investigating.

2              That pattern and practice put Ricardo's

3    case in a new light, in a different light, and finally

4    explained how his wrongful conviction happened.  It lent

5    credibility to an innocence claim that he had been making

6    for two decades and to Zaragoza's affidavits that he made

7    and said that he was pressured by the detectives and felt

8    intimidated.  And it also, and very importantly,

9    undermined the credibility of the one remaining witness,

10   Aurelio Martinez.

11             Based on the overwhelming evidence of

12   Ricardo's innocence, that is when his petition was

13   vacated and charges were dismissed in 2018.  That was on

14   the State's motion.  The State recognized they did not

15   have enough evidence to keep Ricardo in prison and took

16   the extraordinary step of asking courts to let Ricardo go

17   free.

18             And now your Honor should go a step

19   further.  It was ripe for Judge Obbish to vacate that

20   conviction and it's ripe for this court to grant him a C

21   of I.

22             Let's look at the case against Ricardo

23   today, how it stands.  He has an alibi, as I mentioned.

24   He was at home with his mom all night.  There is an

1    affidavit from his mom and from his sister.  Both are in

2    the record, and I can provide these to your Honor as

3    well, but those have been attached to the record.

4              Okay.  There is also no physical evidence

5    that ever tied him to the crime.  In fact, the only

6    physical evidence was this light blue car that they said

7    the person was in that was never tied to Mr. Rodriguez.

8    And all the records showed that he drove a black vehicle.

9              We also have one of two star eyewitnesses

10   against Ricardo Zaragoza who has recanted in full and

11   explained that he was pressured to falsely identify

12   Ricardo by the detectives.  He has provided those two

13   affidavits.

14             An additional witness, Ricardo Sierra, has

15   come forward to tell the truth, that he was there that

16   day and knows Ricardo didn't commit the crime.  And we

17   also have the now established pattern and practice of

18   abuse by Guevara and Halvorsen that the court record his

19   innocence and explained how he was falsely identified and

20   wrongly committed.  And we have attached a number of

21   affidavits and exhibits to support that.

22             So all that remains is this unreliable

23   tainted inconsistent testimony of Aurelio Martinez who is

24   a witness whose identification was the product of Guevara

15

1    and Halvorsen and their corrupt investigation.  And it's

2    completely undermined by their pattern and practice as

3    well as the affidavit of Zaragoza and Sierra.  All of

4    this evidence together, your Honor, demonstrates by a

5    preponderance of the evidence that Ricardo is an innocent

6    man.

7              And the preponderance of the evidence

8    standard, your Honor, is more likely than not.  So what's

9    more likely than not here?  That Ricardo, who has an

10   alibi, no physical connection, two eyewitnesses

11   exculpating him, and two corrupt detectives on the case

12   is another innocent victim of Guevara and Halvorsen.

13             And I know this court is undoubtedly very

14   well aware of the well established pattern and practice

15   by Guevara and Halvorsen, but since this misconduct

16   weighs so heavily on this case and on Ricardo's innocence

17   as well as the one remaining witness that the State cites

18   to, it's important, I think, to review that misconduct

19   briefly because it mirrors exactly what happened in this

20   case.

21   MR. HORVATH:  Your Honor, at this time if I could

22   just object and make my argument for the record, and I'll

23   be brief.

24             With respect to pattern and practice

16

1       material outside of the investigation of Ricardo

2       Rodriguez, I would object because I don't believe it's

3       impermissible -- I don't think it's permissible.  I think

4       it's impermissible propensity evidence.

5                    And the reason I say that, Judge, is

6       because generally speaking, pattern and practice or modus

7       operandi evidence is used to identify an individual as

8       the absconder or the individual who violated in this

9       cease somebody's civil rights.

10                   By way of an example, Judge, if for

11      instance I was a bank robber and I went into the bank and

12      I used a specific mask and specific gun and then ten

13      years later on parole the very next day Chase downtown is

14      robbed by somebody with the same mask and the same gun,

15      the prosecution in most jurisdictions would be allowed to

16      introduce my past gun, mask evidence, to show identity.

17      They use modus operandi to show identity of the

18      individual who committed the crime or in this case

19      committed a constitutional violation as alleged.

20                   Here there is no question.  Here is no

21      question according to their own arguments who in fact

22      violated somebody's civil rights.  It was Guevara and

23      Detective Halvorsen.  That's clear as day.  So they're

24      not using modus operandi to say, well, here we go, we can

17

1           uncover the perpetrator here.

2                      What they're saying, Judge, impermissibly,

3           is they did it once and now they did it again.  It's

4           propensity evidence.  It's not allowed under 404.  That's

5           my objection.

6               MS. MYERSCOUGH-MUELLER:  Your Honor, this evidence

7           is, has been accepted by courts time and again as this

8           pattern and practice evidence and there are cases on that

9           issue.

10                      There is a <u>Patterson</u> case that I can find

11          and cite to that says that this type of evidence is

12          permissible because it shows the pattern of misconduct of

13          these officers which weighs on each case before them.

14          It's evidence that was not known at the time of trial and

15          so could not have been brought up at that time because

16          it's been developed over a number of years, and it shows

17          what their procedure was, what their practice was, and

18          why that is the same thing that happened in this case.

19                      And here we're talking about in terms of

20          Aurelio Martinez.  So what they did over their long

21          careers where this pattern and practice has been proven

22          in courts is very similar to what they did here.  There

23          is a substantial nexus, as we call it, as the cases point

24          to, that that's what they did here, and that explains why

1        Aurelio Martinez has not yet recanted his statement.

2            THE COURT:    So my view of this is that -- my view

3        of that is this.  I have never in any of these cases

4        involving Detective Guevara or any other detective or

5        police officer where it has been alleged has engaged in

6        this kind of conduct in the past, I have never in

7        determining any, any of these cases, looked at that

8        conduct in the past and said because of the allegations

9        of what they done in the past, that means that that's

10       what happened in this case.  I've never done that.

11               There are cases where Detective Guevara

12       has been involved where I have denied a certificate of

13       innocence.  So I sitting here as the arbiter of the law

14       and the trier of fact do not look at that modus operandi

15       and attach those words to, to this purported conduct.  I

16       don't look at this and say, well, then that's what

17       happened in this particular instance.

18               Certainly counsel can make that argument

19       and the court could consider it for whatever it's worth

20       and that's what I do.  If it may impact upon that

21       person's credibility and whether or not I believe or

22       whatever it is they said in a particular matter or I use

23       it for some other purpose.

24               But rest assured, Mr. Horvath, and

19

```
1        counsel, in any of these cases, counsel have almost in
2        every case involving Guevara or other officers where this
3        conduct has been alleged, I'll get recitation of all the
4        cases where they say this has happened.  They're free to
5        make that argument, but each case is going to rise and
6        fall on its own merits.
7              MR. HORVATH:  Thank you, your Honor.
8              MS. MYERSCOUGH-MUELLER:  Thank you, Judge.
9                   So as I was saying, there is a long line
10       of cases in exonerations that support this pattern and
11       practice of abuse that we have been talking about.  The
12       courts have established that the pattern and practice of
13       abuse includes not verifying anonymous tips, tampering
14       and manipulating witnesses in line-ups, torturing and
15       coercing false confessions, falsifying police reports and
16       framing innocent people for murder.
17                   In Ricardo's case we see a fabrication of
18       an anonymous tip, witness manipulation and coercion,
19       falsifying police reports and framing innocent people for
20       murder.  And there, as I said, there are a number of
21       cases.  A lot of them are listed in our pleadings so I
22       won't belabor that point.  But there are a lot of cases
23       that started with this claimed anonymous tip that never
24       existed, just so that the detectives could focus on the
```

20

1      suspect as they wanted to.

2                    In each of these cases with these 20

3      innocent men that have had their convictions vacated or

4      overturned after they were framed for crimes they didn't

5      commit by Detective Guevara and sometimes Halvorsen

6      involve falsifying police reports and some form of

7      manipulating witnesses and tampering with line-ups.

8                    I'm sure also that this court is well

9      versed in Judge Obbish's finding that Detective Guevara

10     told bald-face lies in his courtroom.  He said that he

11     couldn't give an ounce of credibility to him, that he was

12     given immunity to testify in front of him under oath and

13     still lied, and that he had, quote, eliminated any

14     possibility of him being considered a credible witness in

15     any proceeding.

16                   So your Honor, now instead of explaining

17     his actions and standing by his investigations in this

18     case, Detective Guevara has now taken the 5th in this

19     case on questions about this matter.  He was asked

20     questions about his specific conduct and the

21     investigation and had the opportunity to answer what he

22     did and did not do, but instead he invoked the 5th and

23     does not stand behind his investigation in this case.

24                   He took the 5th on whether he lied about

21

1       an anonymous tip.  He took the 5th on whether he coerced

2       Zaragoza to falsely identify Ricardo.  He took the 5th on

3       whether he coerced Martinez to falsely testify, falsely

4       testify and identify Ricardo.  He took the 5th on whether

5       he falsified police reports.  And he took the 5th on

6       whether he framed the innocent Ricardo Rodriguez.

7              Because this proceeding is civil, the

8       court can and should draw a negative inference from

9       Detective Guevara's invocation of his 5th amendment

10      right.  There are cases on this very matter, Judge,

11      including <u>People versus Whirl</u>, which is 2015 Il App 1st

12      111483, saying that a court should draw a negative

13      inference unless there is a good reason not to.

14              Here there is every reason to draw that

15      negative inference.  One of the two State's witnesses has

16      recanted and described those pressures by Guevara in this

17      case.  It fits in exactly with that pattern and practice

18      of abuse we have been talking about.

19              And according to <u>People v Gibson</u>, which is

20      2018 Il App 162177, the court said that as long as there

21      is some evidence to support the complainant's

22      allegations, a court may consider a party's refusal to

23      testify as further evidence of the alleged misconduct.

24              Guevara's insistance on taking the 5th to

```
 1      each of the questions in this case supports that he lied
 2      about that anonymous tip.  It supports what Zaragoza has
 3      sworn to, that he was pressured and coerced to falsely
 4      identify Ricardo.  It supposed that Guevara falsely
 5      identified police reports.  It supports that he framed
 6      Ricardo, a man he knew to be innocent, and it supports
 7      that Martinez, the State's only remaining witness, their
 8      Hail Mary, was coerced to falsely identify Ricardo just
 9      like Zaragoza was and just like so many others have been
10      in these other cases.
11          MS. THOMPSON:  I want to talk now, your Honor, about
12      the evidence that the State is offering to say that Mr.
13      Rodriguez doesn't meet his burden.
14          THE COURT:  I am going to do this -- all right.  I
15      am going to interrupt you and I am going to pass the case
16      once again, allowing me an opportunity to hear a few
17      other cases, and then I will ask you all to return.
18          MS. THOMPSON:  Thank you, your Honor.
19          THE COURT:  I thank you for your indulgence.
20              (WHEREUPON the case was passed.)
21                      *  *  *  *
22          MS. THOMPSON:  As I said, your Honor, I want to
23      address the evidence that the State is relying on to tell
24      you that you should not grant the COI petition.  And
```

23

1       primary, I want to save some time for rebuttal to address

2       whatever they say in response.

3               But I'd like to say a few words about that

4       issue, and obviously if the court has any questions here

5       about the other factors that Ms. Myerscough-Mueller

6       talked about, in particular, the bringing about Mr.

7       Rodriguez's own conviction prong, I want to answer them.

8               But as she said, I don't think that really

9       anything is in dispute here other than whether Mr.

10      Rodriguez has met his burden to show by a preponderance

11      of the evidence that he's innocent.  That's the issue

12      here, and it's a preponderance standard.  It's a

13      balancing question for the court.

14              And so what Ms. Myerscough-Mueller has

15      just laid out to the court, the evidence that is on the

16      side of evidence, Ricardo Sierra, Rudolfo Zaragoza, Mr.

17      Rodriguez's alibi, all of the evidence that says he is

18      not the person who committed this shooting.  So what is

19      the State going to tell you?  What is the State going to

20      tell you that is the reason that you shouldn't grant this

21      certificate of innocence in light of that evidence of

22      innocence which we believe puts us above that

23      preponderance line in terms of the burden?

24              Well, I think what they're going to tell

24

1      you and what they focused on in their pleadings is this

2      witness Aurelio Martinez, so I'd like to talk about him

3      for a second.

4                What Aurelio Martinez testifies to at

5      trial is that he is out drinking that night and he admits

6      that he had been out since 7 p.m.  He claimed at trial

7      despite being out from 7 p.m. until shortly before 1:30

8      a.m., which is about when the shooting happens and about

9      when he finds himself standing in front of his apartment

10     with Rodney Kemppainen and the victim and this other man,

11     Kenneth Rudy, at the time of the shooting.  He said

12     during that entire time he only had two drinks, and that

13     may or may not be true.  But this shooting happens at a

14     very early hour on a Saturday morning after many people

15     involved in this case had consumed some alcohol, Mr.

16     Martinez among them.

17                And he testified that he had, you know, an

18     opportunity to view the shooter and obviously has never

19     recanted that testimony.  And I think that's what the

20     State is going to tell you, that you should credit what

21     Mr. Martinez had to say.

22                My colleague already went through some of

23     the issues with Mr. Martinez in terms of the

24     circumstances of his identification, and I wanted to talk

```
1          about that just a little bit further because it's

2          important here.  And it also explains why it is in this

3          particular case what Detective Guevara refused to answer

4          in taking the 5th and what his history has been is

5          particularly important.

6                          I appreciate what this court said, that

7          the court wants to take each of these matters

8          individually even if they involve the same officers, and

9          from Mr. Rodriguez's perspective, that makes sense

10         because his is a singular case.  It's a case in this

11         pattern where for this court to credit Martinez, for this

12         court to conclude that Mr. Rodriguez hadn't met his

13         burden, that necessarily requires this court in some way

14         to give credit to Detective Guevara and Detective

15         Halvorsen's detective work in this case.

16                         The court can't get around that if the

17         court is going to credit what Mr. Martinez said, and the

18         reason why is this.  Aurelio Martinez is contradicted by

19         Ricardo Sierra, who my colleague already talked about,

20         who really has no reason to lie here and no reason to

21         come forward all these years later to help someone who in

22         his estimation is a member of a rival gang who killed

23         someone that Mr. Martinez testified in his affidavit that

24         he was friendly with and cared about.  Aurelio Martinez
```

26

1      is contradicted by Rudolfo Zaragoza.

2                    Now, Mr. Martinez and Rudolfo Zaragoza did

3      not have the same exact view of these events.  And if the

4      court recalls or will see in their testimony, as I said,

5      Mr. Martinez is standing outside this apartment building

6      on Hamlin.  It's the apartment where Mr. Martinez lived

7      with the victim or with the victim and Mr. Rudy when the

8      shooting happens.

9                    What these witnesses said at the scene was

10     that this car comes down Hamlin, does the shooting where

11     Mr. Martinez and the other people are, then swings around

12     the corner on North Avenue.  And what Mr. Zaragoza

13     testified to is independent of Mr. Martinez, independent

14     of the rest of these people.  He's crossing North Avenue

15     when he intersects with that car.  So he's got a

16     different view and maybe that is that something the State

17     is going to tell you means that what Mr. Zaragoza says

18     has no connection to what Mr. Martinez said.

19                    The problem with that is the method by

20     which they both reach their identifications, one of which

21     is recanted and one of which is not, is exactly the same.

22     Both of them look at gang books pretty soon after the

23     shooting and are unable to make an identification.

24                    And we would say, you know, Mr. Rodriguez

27

1    doesn't have evidence of this because these gang books

2    aren't here for this court to look at, but it stands to

3    reason that Mr. Rodriguez, who all the police reports say

4    was known to be a Spanish Cobra was certainly known to

5    Guevara and Halvorsen because their police reports talk

6    about it, that if they showed these men gang books

7    containing Spanish Cobras in the area, that Mr.

8    Rodriguez's photo would have been in there.

9              And I will admit to the court, it's not

10   something that Mr. Rodriguez can prove, but it stands to

11   reason his photo was in these books.  They look at these

12   books and make no identification.  And at that point,

13   your Honor, this case is DOA.  There is no evidence of

14   who the shooter is.  There is no physical evidence to

15   follow up on.  There is no identifications.  There is an

16   extremely generic description of a person in a car that

17   went down Hamlin and around the corner at a high rate of

18   speed.

19             That car, by the way, doesn't match the

20   car that Mr. Rodriguez drove.  There's police reports

21   where they're looking for Mr. Rodriguez where they

22   describe him having a black car.  The witnesses say this

23   is a light blue car.

24             So there is nothing at all that connects

28

1    this shooting to Mr. Rodriguez whatsoever.  There is no

2    evidence that he is the guy here.  There's nothing.  This

3    case is done.

4                Then Guevara and Halvorsen say, and Mr.

5    Guevara testified, that they get this tip that connects

6    to Mr. Rodriguez.  And when they get this tip, that's

7    when they go back to Zaragoza and Martinez and show them

8    arrays.  And what Mr. Martinez says in his testimony and

9    is reflected in the police report, that even when he

10   looks at the array of Mr. Rodriguez, he says, "I need to

11   see a line-up to be sure."  So then Guevara takes him to

12   the line-up and it's there that he makes an

13   identification of Mr. Rodriguez.

14               That array, that line-up, never happened

15   unless there is this purported tip to put Mr. Rodriguez

16   on the radar, and there is never any corroboration of any

17   of these identifications from either Mr. Zaragoza or Mr.

18   Martinez.  Other than that, they're both making the I.D.s

19   They're in different places.  They're both making the

20   I.D.s.

21               As my colleague said, Mr. Zaragoza recants

22   almost immediately after trial, and he does that, you

23   know, first in 1997.  So if the court is going to

24   disbelieve that recantation and disbelieve what he says,

29

1   even in those reports where he is describing exactly what

2   Guevara is accused of later exactly where, you know, we

3   get this pattern evidence and all of this very public

4   evidence about Guevara, I guess Mr. Zaragoza can either

5   see into the future and foresee some day Mr. Guevara is

6   going to be accused of doing the same thing by a lot of

7   other people or else he is telling the truth when he said

8   clear back in '97 before anybody knew about any of this,

9   that, "Hey, this is what happened to me, Guevara

10  pressured me to make this identification." You know,

11  that is what Mr. Zaragoza says.

12          And I will add as an aside that I think

13  the State and I agree that I at least have looked into

14  Mr. Zaragoza. We concluded that he is deceased. And I'd

15  make that representation to the court. There is no

16  evidence that he is alive. Certainly, if Ricardo

17  Rodriguez could bring Mr. Zaragoza before this court, he

18  would. It just took Mr. Rodriguez too long to get his

19  conviction vacated for Mr. Zaragoza to ever get to

20  testify to anybody. So the court has got to rely on Mr.

21  Zaragoza's words and two affidavits. But he was saying

22  this long before it was ever publicly known about what

23  people were saying that Guevara did. And squaring what

24  Mr. Zaragoza says about his experiences with Guevara and

30

1    Halvorsen with what Mr. Martinez, you know, has never

2    recanted what he said at trial, about making this I.D.,

3    those things just don't fit together.

4              So if the court is relying on Martinez,

5    you have to discount Mr. Sierra.  There's got to be a

6    huge discount of Zaragoza who is describing something

7    very different from Mr. Martinez.

8              And that does lead us to Mr. Guevara

9    taking the 5th.  And my colleague has already explained

10   to the court what he took the 5th about.  But Mr. Guevara

11   had an opportunity to confirm that, you know, his conduct

12   with Mr. Martinez was fine and he didn't do that.

13             And whatever the court thinks about the

14   pattern, it's really the 5th here that is the issue.  The

15   court has to draw that inference unless there is a good

16   reason not to do so, and here, there is no reason not to

17   draw that inference.  And that is partly why this pattern

18   evidence, partly what Mr. Zaragoza is saying is

19   important, because that is what gives the court reason to

20   draw the inference.

21             I don't know exactly what the State is

22   going to say to expand on the argument I just made, which

23   seems to be that because Mr. Guevara is taking the 5th to

24   anything, that this court should somehow, you know, give

31

```
1        his 5th, his exercise of the 5th less credibility.

2                 All Mr. Rodriguez can do is ask him

3        questions in his own case, and it is not the State's

4        burden to prove anything.  So where Mr. Rodriguez has

5        presented affirmative evidence of his innocence, if the

6        State is going to try to discredit that, they've got to

7        have evidence from somewhere to say what Mr. Rodriguez

8        has presented is wrong.

9                 Mr. Guevara is not a source for that

10       because he doesn't even want to talk about this.  He

11       doesn't even want to talk about what's happened.  And in

12       a situation where all signs point to Mr. Rodriguez and

13       his identification having been coerced just like Mr.

14       Zaragoza says that he was, Mr. Guevara taking the 5th is

15       an important piece of evidence that this court should

16       take into account.  There is not a reason to credit Mr.

17       Martinez in a situation where Detective Guevara is taking

18       the 5th about these issues.

19                 I want to say too on the issue of

20       Martinez's credibility, that if what the State is saying

21       is, you know, Mr. Zaragoza is around the corner so it

22       doesn't really matter what he saw connected to Mr.

23       Martinez, as my colleague alluded to, Kenneth Rudy, who

24       is the other witness that's there with Mr. Kemppainen and
```

1    there with Mr. Martinez, all right in front, you know, he

2    says he just sees muzzle flashes.  He's not able to make

3    an identification and he is not a person that police,

4    when Guevara and Halvorsen get this supposed tip and when

5    they're going back to show arrays to people, there is no

6    evidence that they go back and show an array to Mr. Rudy.

7    And we don't know why that is.

8                 But what we do know is that Mr. Rudy

9    essentially has the same vantage point as Mr. Martinez

10   and he's not able to make an I.D.  He is never testifying

11   that there is an I.D. to be made.  That makes sense in a

12   situation where a car is driving by doing the shooting,

13   apparently so quickly that it's shooting at people who

14   aren't even gang members, because Mr. Martinez said he is

15   not one.  Mr. Kemppainen and Mr. Rudy were both homeless

16   people in the area.  They were older people.  There is no

17   real reason to believe that they had involvement in

18   gangs.

19                 It stands to reason that a person doing

20   the shooting, going around that corner at a high rate of

21   speed is not something who Mr. Martinez is going to get a

22   great look at, and yet we have this testimony.  And the

23   only way you can explain this testimony in context of all

24   of this is the identification is not credible and that it

33

1     is not credible enough to stand against all of the

2     evidence of Mr. Rodriguez's innocence, because that is

3     really the issue here.

4               When you do that balancing, what do you

5     believe?  If you are believing that Mr. Rodriguez has not

6     met his burden, and if you're believing Mr. Martinez,

7     then the court is crediting the police work of Guevara

8     and Halvorsen.  The court is crediting the idea that this

9     tip ever occurred.  The court is crediting these

10    identification procedures that they engaged in.  And

11    there simply is not enough there.

12               I want to come back in rebuttal to address

13    what else the State is going to say, but this is not

14    really a Martinez versus everything else.  This is

15    Guevara and Halvorsen versus everything that we know

16    about them, about this individual case.  And in that

17    situation, Mr. Rodriguez has met his burden, your Honor.

18    He spent 23 years in prison.  He deserves a chance to

19    really be free of this case, to be free of the stigma of

20    this conviction, and to be able to move forward, and that

21    is why he has asked for a certificate of innocence and

22    why the court should grant it.

23      THE COURT:  Ultimately, Ms. Thompson, whether or not

24    to grant, the burden still remains upon Mr. Rodriguez to

1   show his innocence.  And so I appreciate your argument as

2   it relates to Mr. Guevara and his tactics, and I think

3   that certainly those may be indicia that the court may

4   consider.

5            But ultimately, so for example, I don't

6   believe I've heard either of you speak to, with any, in

7   any detail, about Mr. Rodriguez's alibi.  You mentioned

8   earlier that there was an alibi, and as I read through

9   your papers, the alibi seems to be that he was with his

10  mom that particular night.

11           But as does happen all too often in these

12  matters, there is this great deal of focus on Guevara or

13  some other officer who's committed some malfeasance, when

14  I don't think that that factor alone is enough for your

15  client to sustain his burden.  It is, as I said, it's a

16  factor perhaps for this court to consider.

17           So I took a little, I was a little -- I

18  wasn't quite on board with you, Ms. Thompson, when you

19  spoke about if the court -- I'll paraphrase you -- but if

20  the court looks at the argument or the evidence one way

21  then the court is obviously, my own word, the court is

22  obviously crediting Guevara's police work or Guevara's,

23  validating his credibility in the matter, and I don't

24  think necessarily so.

35

1              I think ultimately as I go through the

2     analysis, I nonetheless require the petitioner to sustain

3     his burden.  And so you've -- we spent a great deal of

4     time talking about Guevara and how poor his police work

5     and his malfeasance, but what are these other things?

6         MS. THOMPSON:  I appreciate the court's questioning

7     and I don't think I've done my job yet, so let me say

8     this.  It's Mr. Rodriguez's burden, absolutely.  And Mr.

9     Rodriguez is not just saying, "Hey, Guevara and

10    Halvorsen, not good detectives, so therefore I win."

11    We're not saying that.

12             We're saying this.  There are various

13    eyewitnesses to this shooting, and the court has evidence

14    of the perspectives of each one of those witnesses.  It

15    has Ricardo Sierra who is coming down the street at the

16    time of the shooting who gets a look at that car, who

17    knows Ricardo Rodriguez from the neighborhood, even

18    though they're in opposite gangs, and says, "I saw the

19    shooter, it's not Ricardo Rodriguez."  That's what he

20    says.  So that's a person saying Ricardo Rodriguez is

21    innocent.

22             The court has Rudolfo Zaragoza.  He is

23    around the corner but in the vicinity of this shooting

24    and he was shot at himself.  He says -- he says, "I get a

                                  36

1    look at that car. I see the driver, yeah, before at

2    trial and in this, in these identification procedures. I

3    said it was Ricardo, but that's not true. I'm confident

4    it wasn't Ricardo Rodriguez." That's what he said in the

5    second of his two affidavits. So that's not a person

6    that supports his guilt. That's a person saying

7    Rodriguez is innocent.

8                The court has Kenneth Rudy who is in the

9    police report. And Kenneth Rudy says, you know, "I don't

10   know." I mean he doesn't make an identification. He

11   says he sees muzzle flashes and is not really able to

12   give a description. And he is never shown an array,

13   never shown a line-up, and why that is, all of us can

14   only speculate.

15               But when Guevara and Halvorsen decide to

16   go back to them, he is not among them. He is not a

17   person that supports guilt, and he provides no evidence

18   that would say Ricardo Rodriguez is responsible.

19               Then the court has Aurelio Martinez, and

20   Aurelio Martinez testified at trial it was Rodriguez.

21   And we've given you all the reasons to say, "Yeah, I mean

22   that's what he's saying, but to me when I weigh this

23   against the other people, it's not enough."

24               And to go to Mr. Rodriguez's affidavit for

37

1    a minute, there is an affidavit attached to the petition,

2    which is Exhibit 5, which is from Mr. Rodriguez's mother.

3    She signed that affidavit in 2002, and she said that Mr.

4    Rodriguez was home that night.

5              Now, she is elderly at this time.  She's

6    here.  We're not putting her on the stand because she

7    gave an affidavit at a much earlier time when her memory

8    of this was clear.  And she says he was home, and that's

9    also evidence of his innocence.

10              So I agree.  The certificate of innocence

11   statute is here because you've got to do more than just

12   show "I shouldn't have been convicted."  And on "I

13   shouldn't have been convicted," you know, there's no

14   question here, Ricardo Rodriguez shouldn't have been

15   convicted.

16              But he's shown a lot more than that.  He

17   said, "Look at what the people at the scene say.  People

18   at the scene are saying I didn't do this, and the person

19   who is saying that I was the shooter is unworthy of

20   belief" for all the reasons I articulated.

21              Don't grant the certificate because

22   Officer Guevara, you know, is a liar and is a person that

23   stands on the 5th today about the events of this case.

24   Grant him a certificate of innocence because of all the

```
1    witnesses who say he didn't do this, and because the one
2    witness who persists in his old identification is not
3    worthy of belief because their identification has always
4    been and remains tainted by what Guevara and Halvorsen
5    did.  That's what Mr. Rodriguez is telling this court.
6         THE COURT:  Thank you.  Mr. Assistant Attorney
7    General, let me hear from you.
8         MR. HORVATH:  Yes, sir.
9              So once again we're presented with a case
10   in which there are several affidavits and no direction
11   from the 1st district on how to take those affidavits
12   into evidence or in evidence at all.
13             As you know, the Fields matter says you
14   have to take into consideration everything into the
15   certificate of innocence.  So I will go ahead and
16   concede, at least under that, that these are admissible,
17   but I want to talk about the weight of these affidavits
18   as your Honor indicated the weight in this case, because
19   I have a few things that I think your Honor might be
20   interested in.
21             As I look at the three affidavits, the
22   three sets of affidavits, there's Zaragoza's, there's
23   mom's and then there's Sierra.  Okay.  And I refer to
24   these affidavits as essentially the suspect, the
```

39

```
 1        ineffectual, the fraudulent; Zaragoza's being suspect,

 2        the mother's being ineffectual as the mom, and Sierra's

 3        being fraudulent.  I'll get to Sierra's last.

 4                    What I want to know is, if I show this

 5        court evidence, which I don't have to, but if I present

 6        evidence which the court can see with his own eyes, to

 7        see that Mr. Sierra could not see what he says he saw,

 8        then in fact you could see with your own eyes what then,

 9        what then of their case because they've asked you to take

10        a negative inference with respect to Guevara.

11                    But what if there is an affidavit

12        submitted to your Honor which is clearly fraudulent?

13        What then of a negative interest?  And I'll get to that

14        in a minute.

15                    So let's talk about Zaragoza for a minute.

16        So Rudolfo Zaragoza, so I would agree with Ms. Thompson,

17        it would appear he is deceased.  He has been off the grid

18        for at least 16 years.  He comes forward with this new

19        affidavit.  And I'm going to refer to an exhibit and I

20        believe your Honor has them.

21            THE COURT:  I do.

22            MR. HORVATH:   And I know your Honor reads these

23        very carefully.  If you need to follow along, great; if

24        you don't, that's fine.
```

40

1      His first affidavit comes post conviction

2      and before Mr. Rodriguez -- and this is, Judge, this is

3      exhibit -- my apologies for the record.

4          THE COURT:  People's Exhibit No. 3.

5          MR. HORVATH:  Three.  Yes, sir, that's correct.

6      So his first affidavit at least is sworn

7      and subscribed to on May 14, 1997, which is prior to the

8      date that counsel's client was convicted prior to his

9      post trial.  And there is two relevant statements in

10     there.  One is, it might not be him.

11     Now, that statement could be taken one of

12     two ways.  It could be him or it could not be him.

13     Zaragoza is now saying he doesn't know.  This is in 1997.

14     The second statement that he attributes

15     to, and I'll concede sounds like it might have been

16     Guevara but we actually don't know, is "This guy right

17     here is Casper from the Cobras.  He is locked up now."

18     Now, the problem I have in trying to

19     defend it, although I don't, is we don't have the one

20     great truth teller at our disposal -- and that is no

21     fault to Ms. Thompson -- and that is contemporaneous

22     cross-examination with respect to these affidavits.

23     But I for one would like to know the

24     context in which he provided this affidavit.  For

41

1    instance, he testified that he was from the area, from

2    the area where the shooting occurred, which was also an

3    area, the record will reflect, is where, just adjacent to

4    where the petitioner was, a rival gang.

5                    So the question I have, and I'd like to

6    ask Mr. Zaragoza if I could, was, did you have a problem

7    when you went back to the neighborhood?  Did you have to

8    explain your conduct taking a stand, you a former gang

9    member?  That's in the record.  Was there any issue when

10   you returned to the street that would have given you some

11   motivation to come off your testimony earlier?  We don't

12   know that.  We don't know that through no fault of Ms.

13   Thompson.  We just don't know that.  He was never

14   cross-examined on those affidavits.

15                   The other thing he says, though, which is

16   interesting -- and again, the context is interesting,

17   Judge, because he says, you know, this guy right here is

18   Casper from the Cobras, he is locked up right now.

19                   Well, Mr. Zaragoza's trial testimony is

20   that he knew Rodriguez, at least from sight, that he knew

21   as leader of the Spanish Cobras' gang that he has seen

22   before.  He testified to that before that even on

23   cross-examination.

24                   So what I would like to ask Mr. Zaragoza

42

1    is, if I could, is, did you pick him out and then express

2    concerns to one of these detectives you're going to have

3    a problem getting back to the street if you identify this

4    guy, and then if someone says "don't worry, he's locked

5    up," is that what really happened or is that a nefarious

6    statement?  We don't know that, Judge.  We don't know

7    that.

8              But we know in 1997 that's as far as he

9    was willing to go is say "I'm not certain and a statement

10   was made to me" which could appear on the face to be

11   untoward but we don't know the context.  It might not be

12   untoward at all.

13             Now, again, I have an issue with

14   affidavits, but this is the position we're in.  This

15   affidavit of course was drafted by Mr. Rodriguez's trial

16   attorney.  And I impute no ill will or any suspect

17   motivation on his behalf.  But he is trying to get Mr.

18   Zaragoza to get as far afield from his testimony as

19   possible.  I mean that's his job.  He doesn't believe Mr.

20   Zaragoza's testimony, so he goes to Mr. Zaragoza and does

21   his best to convince him to come off his testimony.  It

22   happens all the time.  I'm not suggesting anything.  But

23   is that as far as he would go?  I don't know.  So again,

24   I don't know what we can do about that affidavit.

43

```
 1              But here comes the second affidavit and it
 2     makes it very suspect to me.  In 2002, now it's "I'm
 3     100 percent certain it's not Casper."  Five years later,
 4     100 percent certain it's not Casper.  And it's, quote,
 5     strongly hinted to me to I.D. Casper.
 6              I have a very simple question of Mr.
 7     Zaragoza.  How in the world do we get there five years
 8     later?  I mean there is no question that the same
 9     attorney, presumably the same attorney was trying to get
10     you to come off your first affidavit as best as you
11     could.  What happened in those five years?  I think
12     that's suspect, Judge.
13              We know the first affidavit wasn't good
14     enough.  It was rejected, rejected by the trial court.
15     It was rejected by the court of appeals. Now here comes
16     Mr. Zaragoza with a second affidavit.  Why the second
17     one?  Why such a change in tune?  We don't know, Judge,
18     we don't know the context of it, and that goes to the
19     weight of the evidence.  There are simply questions that
20     this court cannot determine based on what's presented
21     here.  And again, no fault to Ms. Thompson.
22              But we just don't know.  It's suspect.
23     Something is not right with this affidavit.  There is
24     something underlying in this affidavit.  I don't know
```

1    what it is.  But on the face of it, suspect, and the

2    weight to be afforded to it should be very well.

3                    I'd also mention one more thing, Judge.

4    The appellate court.  There were two appeals in this

5    case.  The first appeal went to the police misconduct and

6    issues of that matter.  The appellate court, and I don't

7    know if they were quoting the trial court so I have to

8    apologize.

9                    But the appellate court said Zaragoza's

10    recantation was, quote, grave doubt.  That's what it says

11    at the trial court, with grave doubt.  Now, I don't know

12    if that was the appellate court's language or the trial

13    court, but somebody viewed it with grave doubt.

14                    And then there comes the second affidavit.

15    The State has a problem with that.  The State would like

16    to know what's going on there.  The ineffectual, Judge,

17    Mom's affidavit.  I mean no disrespect to mothers, I have

18    one as well, but the affidavit is both suspect and

19    ineffectual, and here's why.  First, why are you coming

20    in 2002 to tell us about your son if you had an alibi?

21                    Now, I used to be a prosecutor.  I've also

22    defended criminals in court, all types.  One of my

23    favorite excuses I always heard was, "the public defender

24    didn't want to hear it, they didn't contact me."  That's

45

1      what she said in the affidavit, right?  "Nobody contacted

2      me."

3                Well, I'm fairly certain that five years

4      earlier if you knew your son was on trial for first

5      degree murder, She didn't come forward to anybody?  I

6      don't know about this mother, but I know mothers that

7      would make it real clear to the public defender's office,

8      to the private attorney and to the court if necessary and

9      under contempt for however loud they have to do it, that

10     in fact "I'm a witness to this case and I have an alibi

11     for my son."  She doesn't bring that forward in 1997,

12     1998 or -- excuse me, '96, '97, '98?  She just comes

13     forward in 2002 and she throws the defense attorney under

14     the bus as an explanation.

15                The ineffectual part of this objection is

16     actually what she says in her testimony.  She says that

17     her son comes home that night and she suggests to him,

18     "It's too cold, you need to stay inside."  She locks up

19     the house.  She goes back to sleep.  I believe this is

20     around 11 o'clock, I believe, is her testimony, Judge.

21                And I have to apologize, I don't want to

22     misstate it on the record.  Just before a little before

23     11:00 p.m. she says her son comes home -- and this is

24     Exhibit No. 5 -- she says she locks up and goes to sleep

1    and her son is there the next morning.

2              Well, Judge, this shooting occurred just

3    blocks away from the house.  The record is real clear and

4    it's not disputed that Ricardo Rodriguez lived in the

5    adjacent neighborhood of where the shooting occurred at

6    1604 Hamlin.  So he's right down the block.

7              But where is Ricardo Rodriguez at 1:48

8    a.m. is what I want to know.  She can account for him at

9    11.  She can account for him the next day.  Is the

10   affidavit to be read that she locked in her son in the

11   whole night and he didn't get out?  I think the fire

12   department would have a problem with that.

13             But I'm pretty sure that her son, who is

14   the leader of the Spanish Cobras, didn't always listen to

15   mom.  That's probably how he got to be leader of the

16   Spanish Cobras.

17             So her affidavit is a little suspect, and

18   evidentiary speaking, it's ineffectual.  It does not

19   account for her son's whereabouts at 1:38 a.m. on that

20   15th -- excuse me, yes on that day in December.  It just

21   doesn't -- it's ineffectual.

22             But Judge, my -- the most interesting

23   affidavit of all, the most interesting -- you know what?

24   Judge, I apologize.  I apologize for disjointing this.  I

47

1    want to turn to Mr. Zaragoza for a minute because it

2    actually came up in the exhibit.  I do want to turn to

3    it.

4                   Mr. Zaragoza views a photographic line-up

5    after he views gang books and the gang books didn't show

6    the individual he already knew, Ricardo Rodriguez.  So if

7    he'd seen Ricardo Rodriguez in the gang books, it's

8    presumable he would have identified him, which lends

9    credence to the fact that maybe he wasn't there, which

10   lends credence to the fact of why if it's in the exhibits

11   why Guevara is taking a picture of Ricardo Rodriguez.

12   And I can return to that in surrebuttal, but I'm going to

13   stay away from Guevara stuff for a little bit.

14                  But my point is this.  So after about

15   three and a half weeks after Zaragoza identifies -- I

16   think it's on the 27th of December -- identifies Ricardo

17   Rodriguez in a line-up, he then goes to a show-up, a

18   show-up of Ricardo Rodriguez.  Now, I suppose the

19   argument is going to be well, that line-up -- excuse me,

20   that photo array tainted the subsequent identification at

21   the line-up.  All this is in the exhibits, by the way.

22   It's all a matter of record that Zaragoza then did a

23   line-up and identified Ricardo Rodriguez.

24                  But it was three and a half weeks later.

                                48

1    It wasn't by a homeless man who did drugs.  There was a

2    lot of life lived by Mr. Zarazoga between the 27th of

3    December and when he did this line-up about three and a

4    half weeks later.

5                    The most interesting thing about what

6    occurred in that line-up -- and again, it's in

7    Exhibit 12, Judge -- if he was incarcerated on another

8    matter apparently in Cook County lock-up, and when he

9    came up to view that line-up, he wasn't alone, Judge.  He

10   had his public defender with him, Cathy Wall, the late

11   Cathy Wall.

12                   So the question is, if the allegation is

13   that Zaragoza was going for shenanigans, he had a perfect

14   opportunity to put a stop to it, at least if not then

15   beforehand when he is speaking to Ms. Wall.  This is very

16   important too.  There is no allegation that it didn't

17   happen that Zaragoza was given any, that Zaragoza was

18   charged in this offense or had a case hanging over him by

19   the State that they were using to flip him, so to speak.

20   There was no untoward pressure by the state's attorney.

21   Zaragoza was locked up on a different charge and he was

22   brought up with his public defender on that charge and

23   made an identification.

24                   The allegation against Guevara is always

49

1    that he also does these things on his own, that he

2    tramples on people's rights, all these kind of things.

3    But he allows it.  It's at a police station.  He doesn't

4    do it in a surreptitious manner.  But he allows the

5    public defender to come up with her client and make that,

6    that identification in the show-up.

7                    He was under no legal obligation to do it.

8    Mr. Zaragoza was incarcerated on a different case.  So it

9    wasn't like he had to notify the public defender, he had

10   to go to the state's attorney and say, "You know, hey,

11   I've got to have somebody who is incarcerated on this

12   offense come up with the identification in this offense

13   and he is a representative."  It wasn't that case.

14                    So you know, they go on the photo line-up,

15   but I'm -- what about the identification three and a half

16   weeks later when your public defender is sitting right

17   there on another matter, you know?  But there is no

18   hesitancy in that identification.  There is nothing to

19   impugn that identification.  It's only the suspect

20   affidavits that impugns the identification.

21                    So I thought that was an interesting note

22   that's in the exhibits, the fact that he was actually

23   represented at the show-up.  I found that to be

24   something.

50

1            Let me get back on track.  Ricardo Sierra,

2       that is the fraudulent.  Ghandi, that's his nickname.

3       Candidly, Judge, this affidavit smells a little bit.

4       Twenty years later here comes Ghandi after, of course,

5       Zaragoza, who presumably Ghandi would know because he

6       lives in the neighborhood with him is deceased.

7            Now, let me be very clear about something,

8       very, very clear.  Counsels have a good reputation in my

9       office.  I'm not impugning their reputation whatsoever.

10      I'm not suggesting that the Exoneration Project is behind

11      any fraudulent affidavit.  That's not my point.  I'll

12      make my point in a minute about why this is fraudulent

13      but impute no wrongdoing to them, okay?

14           But this is a fraudulent affidavit.  This

15      is a lie, okay?  So Ghandi comes back in 2016 out of

16      nowhere and says, "I'm there."  Well, the thing I want to

17      know is, how did Ghandi even come to light anyway?  He is

18      not here again to be contemporaneously cross-examined,

19      right?  So we don't know what the issue is.  We don't

20      know how it came about.

21           We know an investigator went to speak to

22      him.  How did the investigator know?  Who told the

23      investigator Ghandi would have information about this?

24      We don't know.  We don't know any of these things.  We

                              51

```
1    don't know how this affidavit came to light.  But I might

2    shed some light on it in a moment but maybe I won't.

3                    He also recalls in 2016 extremely vivid

4    details.  How did he know that?  A gang member that lives

5    in a pretty violent neighborhood, he admits to drinking

6    that night.  Perhaps he was doing drugs.  Who knows?

7    Perhaps he did drugs in the 20 years intervening.  We

8    don't know, we don't know.  It all goes to weight.

9                    And what about his bias?  What about his

10   bias?  I'd like to ask him about his bias, because in his

11   affidavit he references a couple people.  And this your

12   Honor can take judicial notice, in paragraph 16 of his

13   affidavit he references individuals known as Pistol Pete

14   and Mondo.

15                    Now, hopefully, your Honor, you're not in

16   this deep in the world of the Spanish Cobras, the

17   Imperial Gangsters, the Puerto Rican Stones and the like

18   in that neighborhood back in the day.  But your Honor can

19   take judicial notice of the fact that this is all over

20   the place and won't be contested.

21                    Pistol Pete and Mondo are Armando Serrano

22   and Jose Montanez.  They've been before, I don't believe

23   this court, possibly another court, on a certificate of

24   innocence.  They are fellow Imperial Gangsters who have
```

52

```
 1        brought up cases against Guevara.

 2                   I just wonder if I could cross-examine

 3        Ghandi, I just wonder, did he ever speak to his fellow

 4        I.G.s, Imperial Gangsters, who bring all these cases and

 5        allegations against Guevara?  Is that how he was found?

 6        I wonder this.  I wonder his motivation.  He brought

 7        these people up in his own affidavit.  I'd like to know

 8        how some of these affidavits come about.  I won't, and

 9        that goes to weight, and your Honor won't either and that

10        goes to the weight of the affidavit.

11                   One of the things that I found interesting

12        about this affidavit, Judge, and I'll go to two things.

13        The first thing is just what he says basically, the

14        details.  And he claims -- and this is all contradicted

15        by the record and I'll point this out -- he claims there

16        is a block party, if you recall, right outside of 1604

17        North Hamlin.  That's what he says, that everybody is out

18        there drinking at around 1:38 a.m., around that time, and

19        that there is about 20, his affidavit says about 20 guys

20        out there with their girlfriends, so maybe 30, 40.

21                   And they're out there at 1:30 in the

22        morning and they're all eating pizza, and he called it

23        football pizza in his affidavit.  That doesn't strike me

24        as credible.  First, I just happened to look this up and
```

```
1        something your Honor can take judicial notice of, I
2        brought a print-out in this pile of stuff.  The mean
3        temperature on that date was 29 degrees, below freezing.
4        The minimum temperature on that day, according to the Old
5        Farmer's Almanac, which is traditionally used and people
6        take judicial notice of it maybe back to the time of
7        Abraham Lincoln.  The minimum is 23.9 degrees which is
8        probably what it was at 1:30 in the morning.
9                 I'm not suggesting people don't congregate
10       on the street to have a little party.  I'm not suggesting
11       any of that.  I'm suggesting a huge block party,
12       pizza-style party at 1:30 in the morning when it's
13       roughly 23 degrees doesn't sit with me very well,
14       particularly in light of the fact that Aurelio Martinez
15       testified that it was very chilly outside, and that mom's
16       own affidavit said she wanted to keep her son inside
17       because it was too cold outside.  I just have a problem
18       with that.
19                 But there is one issue with the weather
20       that I'll get to in a minute.  It goes directly to what
21       Mr. Sierra said.  Mr. Sierra says he is walking down --
22       you know what, Judge?  At this point in time let me mark
23       something as an exhibit so your Honor can see it.  And
24       what I'm marking as an exhibit, I'll just mark People's
```

54

1          COI No. 1.  I previously tendered a copy of this.

2                    What I'm tendering as People's COI No. 1

3          is my attempt at using Google Maps to illuminate the

4          neighborhood and specifically 1604 North Hamlin.  And so

5          I want to talk about what happened in the trial testimony

6          and now what Ricardo Sierra says.  And this is something

7          that I previewed earlier.

8                    Ricardo Sierra says in his affidavit that

9          he is walking on the west side of the street, southbound

10         on Hamlin Avenue, through his, down the street from his

11         house.  I have no issue with that.  That's what he says.

12         You can see the sidewalk here leading towards the red

13         bubble that's marked 1604 Hamlin.

14                   He says that at this point in time -- and

15         I'll get to his identification, Sierra's identification

16         of the shooter -- but he says at this time shots are

17         fired, and in his own affidavit he says that he ducks

18         into the alley, the only alley that I could assume,

19         Judge, and I don't think there is much dispute, there is

20         an alley running just to the north of where the red

21         bullet point is.  You can see that alley there running

22         east and west, just north of what is North Avenue.

23                   And so what Sierra says is, "Well, I

24         ducked into this alley behind a trash can."  That's what

                                    55

1       he says.  And he says, "I don't see the car drive off."

2       Now, that's key, okay?  He says he doesn't see the car

3       drive off.  This is in his affidavit.  This is in

4       paragraph 8 of his affidavit.

5       The problem is, Judge, he later says that

6       he sees one of the guys almost get run over.  This is a

7       problem.  He says he sees one of the guys almost get run

8       over.  We know who that is, okay?  There is no evidence

9       to the contrary that the individual that was almost run

10      over was Zaragoza, okay, for which the petitioner was

11      convicted of an attempt murder charge.

12      If you recall, Zaragoza says he was

13      walking and he was almost hit and there was a cessation

14      with Rodriguez shooting at him.  That's what his

15      testimony is.

16      Here's the problem, Judge.  Here's a big

17      problem.  And I brought this for you because I don't want

18      to misstate anything.  I'm going to hand you the record

19      of Mr. Zaragoza's testimony because I want you to see it

20      for yourself.  Now, this is unrebutted, unimpeached.  For

21      the record, I'm showing you page 79 of the record,

22      page 79, line 12, December 16, 1995.

23      "Do you recall what you were doing in the

24      evening hours" -- Judge, this is the prosecutor, for the

56

1    record, Rudolph Zaragoza, Rudolfo Zaragoza.

2                     Answer:  "Yes.  I was going up Hamlin."

3                     This is key, Judge.  This is very key.  If

4    your Honor looks at the photo, Hamlin is split, so if you

5    go northbound on Hamlin to North Avenue, Hamlin is

6    actually a little bit to the west.  When you proceed

7    on --

8        THE COURT:  Is North Avenue south?

9        MR. HORVATH:   North Avenue is a big one going

10   east-west.

11       THE COURT:   But is it south of 1604?

12       MR. HORVATH:   You got it.  So Hamlin on the south

13   side of North Avenue is kind of adjacent.  And as you

14   cross North Avenue, you have to go east to pick up Hamlin

15   again.  Remember, that's where Sierra says he is.  He is

16   on Hamlin behind a dumpster.  He doesn't see the

17   shooter's car run off, right?  Or excuse me, he's in an

18   alley.  Here's where Zaragoza is.

19                     "And prior to walking down Hamlin, where

20   were you at?"

21                     "I was on Hamlin crossing the street

22   towards the liquor store."

23                     This is key, Judge.  The liquor store is

24   actually at 1604 North Hamlin.  The record, and it's

1    undisputed, the record is it's a multi-mixed unit

2    apparently or maybe two adjoining buildings.

3                    But 1604 was just north of where this

4    liquor store was, apparently a storefront on North

5    Avenue.  That's uncontroverted.

6                    Turning over to page 18, Judge, line 16.

7    "Do you recall where you were at at 1:30 in the morning,"

8    the prosecutor to Zaragoza.

9                    "I was crossing North Avenue going

10   northbound."

11                   "And where were you going to the store?"

12                   "To the liquor store."

13                   "And what corner is the liquor store on?"

14                   "On the northwest side."

15                   "And is that of North and Hamlin?"

16                   "Yes."

17                   Judge, I'm not going to belabor the point

18   here, but it is uncontroverted that whoever did the

19   shooting that day almost ran over Zaragoza while he was

20   on North Avenue crossing, or excuse me, as he was walking

21   north, crossing North Avenue, going to the liquor store

22   on the northwest corner.

23                   Ghandi said -- Ghandi said in his

24   affidavit -- it's his own words -- that he sees somebody

                                58

1    almost get run over.  Judge, he is hiding behind a

2    dumpster behind the building in the alley north of

3    Hamlin.

4              If you look at where Zaragoza almost got

5    run over, no way he sees it.  There is absolutely no way

6    he sees it.  He would literally have to see through 1604

7    North Hamlin.  That's what he would have to do because he

8    is behind 1604 North Hamlin.  How would he know that?

9    Did somebody tell him?  How did he get that information

10   20 years later to come before this court or not and put

11   it in an affidavit?  How can he claim to have seen

12   something that your Honor can see with this map is

13   physically impossible?  He could not have seen Zaragoza

14   crossing North Avenue from where he says he was and

15   almost being hit by the car.  Impossible.  You can't do

16   it.

17             And if the map doesn't convince you, let

18   his words convince you.  He said he never saw the car

19   drive off.  Well, if you didn't see the car drive off --

20   that's in paragraph 8 as well -- how did you see it

21   almost run over somebody?  Again, were you talking to

22   your fellow I.G.s when you got back to the neighborhood?

23   I don't know.  Mondo and Pistol Pete, did they have

24   information?  I don't know.

59

1          These are all questions I would like to
2    ask Mr. Sierra if I could contemporaneously cross-examine
3    him.  I can't.  And it goes to the weight of the
4    affidavit.
5          But one more thing is interesting, Judge.
6    In paragraph 7 when giving his description of the
7    shooter, he says that the shooter was in a tank top.
8    Judge, again, it's 23 degrees or thereabouts that night.
9    I don't know about you, but if I retire, maybe I have to
10   look at North Hamlin.  It appears nobody gets cold that
11   night.  I mean the shooter is in a tank top in mid
12   December in 20-some odd degree weather?
13          But another issue with that, and here's
14   the problem with that, that's controverted, Judge.
15   That's controverted because Mr. Martinez testified much
16   more credibly that the shooter was in a black jacket or
17   coat.  That's clearly in the record.  I can point that
18   out.  That's the testimony.  It makes a lot more sense.
19          So when Mr. Sierra puts this evidence
20   before the court, your Honor can see with his own eyes
21   that he could not have seen what happened.  It's not
22   possible to have seen it the way he says he saw it.  He
23   didn't even see the car drive off he tells you in
24   paragraph 8.

60

```
1               In addition, what he is saying is

2      controverted by the record, not just the fact that it's

3      quite obvious that somebody rolling around at 1:30 in the

4      morning is going to have a jacket on in freezing

5      temperatures.

6               But the testimony is even worse for him on

7      that, because he claims there is a block party, at least

8      30 people out there, including himself.  The problem is,

9      Judge -- and I can show you again in the record if your

10     Honor wishes to see it -- Mr. Martinez, when he

11     testified, was specifically asked, "Who do you see in the

12     area?"  He included two people, Rodney and Rudy, this

13     other individual that was referenced.  "Who did you see

14     in the area?"  That's what he said, those two people.

15               I'm fairly certain that if there was a

16     block party, a pizza party, out in front of Mr.

17     Martinez's residence at 1604 Hamlin, he would have seen

18     it.  But he didn't see that.  He said the only two people

19     out there were the two people he saw, Rudy and the

20     decedent.  Completely contrary to the undisputed trial

21     testimony.

22               It's fraudulent.  Something doesn't smell

23     right with this affidavit, not 20 years after the fact.

24               But Judge, I'll go ahead and jump forward.
```

```
 1        Aurelio Martinez.  Let's be real clear, his credibility,

 2        yeah, his credibility has been questioned today.  He

 3        hasn't been called a liar, but basically he would have to

 4        be a liar for your Honor to grant this petition because

 5        this is -- he would have obstructed justice, right?  And

 6        then he would have got on the stand and committed

 7        perjury.  I mean he certainly would have known if he was

 8        lying about an identification, right?

 9             So that's it, right?  They want to say,

10        well, they are all relying on Martinez.  I'm actually

11        not.  I'm showing you how these affidavits in support

12        actually are good for me, because they're so suspect,

13        your Honor has been to wonder what's going on here.

14             But Aurelio Martinez, Aurelio Martinez

15        stated that -- and you've seen it and I won't belabor

16        it -- he was 10 to 12 feet away.  They had an apparent

17        stare-down, right, if you recall, the shooter?  The

18        shooter goes into the westbound lane so he is closer to

19        him, and everybody is looking.  I'm sure it's a tense

20        moment.  And maybe it wasn't 15 to 20 seconds, but it

21        certainly was a good look, right?  There was, you know,

22        hearts pumping.  He said the light is on.  Nobody

23        disputes that.  Even Sierra says there's lights

24        everywhere in his affidavit.  You know, he says, Martinez
```

1      says there might have been a light on the car, he is not
2      sure, but he could see the light inside the car.

3                    So the area is well lit.  Nothing to
4      obstruct his view.  Not under the influence.  But his
5      reputation is being impugned.  He's essentially being
6      called a liar.  The record reflects he's a family man, he
7      lived there, married, had a child, worked as a security
8      guard for an agency, had no gang affiliation, any record,
9      was not drunk, no impeachables.  Sierra's affidavit
10     impugns that?

11                   And what about the look?  The look that he
12     got was very good, he being Martinez.  Obviously very
13     good.  Nobody can say based on the record it wasn't.  But
14     what about the look that Ricardo Sierra got?  He says
15     he's walking southbound on that sidewalk before he comes
16     to the alley and that the car's going southbound on
17     Hamlin.  So as his car is passing by him, he looks over.
18     That's the look he gets, the side look as the car is
19     passing him by.

20                   And by the way, the car is probably in the
21     right lane at that point in time, the correct lane, which
22     would be further away from what Mr. Martinez testified to
23     which is that the car swerved into the other lane and
24     then they had this staring contest.

```
1              Judge, if your take all three of these
2    affidavits and you even put them in 23-degree weather,
3    something still doesn't smell right.  And so my case
4    isn't just Aurelio Martinez.  My case is Aurelio Martinez
5    plus a bunch of suspect affidavits which would suggest,
6    at least to me, that something untoward is going on here.
7              Whether he is innocent of this offense or
8    not, as your Honor correctly stated, it's their burden by
9    a preponderance of the evidence to bring forward and they
10   have not.  Their best affidavit is clearly fraudulent.
11   Their other affidavits are suspect at best.
12             I ask you to deny the petition.  Thank you
13   for your time.
14        MS. THOMPSON:  I want to be brief, but there is an
15   few things I need to say, your Honor.
16             You heard from the State exactly what I
17   think Mr. Rodriguez predicted you would hear, which is
18   that you have to, this court has to credit Mr. Martinez
19   in order to deny Mr. Rodriguez's release.  They
20   encouraged you to look carefully at these affidavits, and
21   Mr. Rodriguez encourages you to do the same, because
22   that's the evidence here.
23             But what the State is essentially saying
24   is, don't believe Sierra because it contradicts Martinez,
```

64

1    and don't believe these other witnesses because they're

2    not enough.  I mean Martinez is the tent pole of their

3    presentation and nowhere did I hear the State explain why

4    Martinez has credibility outside, setting aside somehow

5    his interactions with Guevara and Halvorsen that lead him

6    to give this testimony and make these I.D.s, and that's

7    the problem.

8              On its face, to address some of the

9    specific points about Sierra, Martinez is coming home

10   from the south as well.  In his testimony, he doesn't

11   say, "I walked down," you know, "my block of Hamlin to

12   get to my house."  He is also coming from the south.  And

13   so whether he was paying attention to what was going on

14   on the block or not, there is no reason he would have

15   been.  I mean when the State says if there was a block

16   party, he would have known it.  Why?  He didn't walk down

17   that part of the block.

18        MR. HORVATH:  Judge, I'm going to object.  That

19   misrepresents the testimony.  Sierra is saying the

20   shooting occurred in this crowd of people in front of

21   1604 Hamlin.  That's what he says in the affidavit.

22        MS. THOMPSON:  This block party is not in front of

23   the apartment.  Martinez says he goes -- Sierra says he

24   goes to heat up this pizza and bring it back to where Mr.

1    Rudy is.  He doesn't say that all those people are at the

2    south end of the block.  The court can look at the

3    affidavit and see that.  I mean that's not what he says.

4    He says that block party is going on the block and he

5    comes down the street to give Mr. Rudy his pizza.  That's

6    what he says.

7                    And it makes sense anyway, because exactly

8    for the reason I said earlier, this is a drive-by.  Who

9    is driving by to shoot at Mr. Martinez?  Not a gang

10   member.  You know, Mr. Kemppainen and Mr. Rudy, with all

11   respect to them, are not going to appear to anyone to be

12   gang members.  They're older gentlemen that are drinking

13   outside on this block.  That is not part of whatever is

14   going on.  I mean whoever is on that block is on the

15   block because of other people that are present.  And so

16   it stands to reason, this is a gang shooting.  It doesn't

17   target these people.  Something else is going on here.

18                   But the importance of what the State is

19   saying is, credit Martinez because that's different than

20   what Mr. Sierra is telling you.  Mr. Sierra's affidavit

21   on its face says that the thing, the person he thinks

22   almost got run over was Rudy or one of the other guys.

23   And he says, "I didn't see the car leave because I was in

24   the alley."  He's not talking about whatever is happening

1      with Mr. Zaragoza on the corner.

2                  I mean that's what Mr. Rodriguez was

3      talking to about in his argument earlier.  He is talking

4      about something that Mr., that Mr. Sierra can see from

5      here and whatever he is describing is something happening

6      up here.  So he is talking about somebody getting run

7      over.  He's talking about the car being up here and the

8      people standing in front.  He is obviously not talking

9      about Mr. Zaragoza.

10          THE COURT:  When you say the car being up here, I

11     don't know what --

12          MS. THOMPSON:  Sure.  I want to be clear.  Where

13     they've got their little red arrow here.

14          THE COURT:  Which indicates the address of 1604

15     Hamlin.

16          MS. THOMPSON:  Right.  That's on Hamlin.  That's

17     where the car stops and where the shooting is.  And

18     that's what Mr. Sierra has a view of here.  Whatever

19     happens with Mr. Zaragoza here on North Avenue, that's

20     not who he identifies.  That's not what he is describing.

21     He is talking about events he sees here on Hamlin.

22                 And so that's what Mr. Sierra is talking

23     about what happens here.  And that's where Mr. Rudy and

24     Mr. Martinez and Mr. Kemppainen are standing is on

                              67

```
1        Hamlin.  I agree, whatever happens with Mr. Zaragoza is
2        somewhere else and that's not what Mr. Sierra is
3        describing.
4                    And it's true that this is Mr. Rodriguez's
5        burden and that he could have called Mr. Sierra rather
6        than relying on his affidavit, and that's not how we
7        presented this case.  But it's not true that the State
8        can't cross Mr. Sierra.  They could have called anyone to
9        testify at this hearing they wanted to.
10        MR. HORVATH:  Excuse me, Judge.  I object.  Shifting
11        the burden.
12        MS. THOMPSON:  No, they've got no obligation to
13        present anyone.  But if they're going to tell you not to
14        believe Mr. Sierra and to posit hypothetical reasons,
15        things that could have been going on that make things not
16        believable, they could have put anyone in front of you
17        that they want to and they didn't do that either.
18                    So the court has the record in front of
19        it.  It can consider what it wants to consider from these
20        affidavits.  But the State, to suggest possibilities
21        about why not to believe Sierra, why not to believe his
22        mother, why not to believe Zaragoza and what was going on
23        with the affidavits in '97, you know, the State could
24        present evidence if they wanted to.  They don't have to.
```

1     But them saying, well, here's some things to think about,

2     Judge, that's not enough to overcome the burden.  It's

3     not enough.

4               When they talk about Zaragoza as well, you

5     know, when they say, you know, maybe this is what was

6     happening with his affidavit, they're guessing.  They're

7     guessing just like they're guessing with these other

8     witnesses.

9               And I will say this, your Honor.  They

10    want to tell this court to believe Martinez's original

11    identification, to believe Mr. Zaragoza's original

12    identifications, identifications that come after

13    initially those witnesses are not able to make I.D.s.

14    They're asking you to believe that, and they're telling

15    you essentially, well, nobody can ever know about that.

16              Well, the best person to know what

17    happened in those identifications with Mr. Zaragoza and

18    Mr. Martinez is Detective Guevara and he is not talking.

19    And the State obviously is staying as far away from him

20    as possible.  They're not even really mentioning his name

21    in their closing arguments.

22              But there is a person that knows what

23    happened in those identifications.  That person chose not

24    to talk about this.  So there are answers here.  Those

1    answers are with Detective Guevara taking the 5th about

2    what happened.

3              And we're not calling Mr. Martinez a liar,

4    you know, by saying, I think Mr. Martinez is a dirty

5    liar, a dirty obstructor of justice.  That's what I say

6    to this court.  There is somebody who obstructed justice

7    and who manipulated these I.D.s and who made it so Mr.

8    Martinez would testify the way he did, and that person

9    took the 5th when he was asked about it and that person I

10   am calling a liar and an obstructor of justice.

11             And that's a reason for this court not to

12   credit Martinez, not because -- it's obviously not his

13   goal to wrongfully convict Mr. Rodriguez.  It's somebody

14   else's goal, and that person took the 5th when they were

15   asked about it.

16             It's Mr. Rodriguez's burden.  It's a

17   burden he embraces.  He's presented the best evidence he

18   could from people who know what happened.  The State's

19   given you their guesses about why you shouldn't credit

20   these people.  They stayed as far away from the real

21   answers in this case as possible.  And this is the case

22   the court has.

23             And in some ways maybe this seems like,

24   you know, some difficult case to parse through these

                              70

```
1    witnesses and to reach a final conclusion.  But we're in

2    a preponderance of the evidence standard.  This court

3    doesn't have to have every single question about this

4    case answered.  It's just got to decide what is more

5    likely here.  Is it more likely that Mr. Rodriguez, where

6    all the evidence that says he did this come from a person

7    who took the 5th, who won't even talk about what

8    happened, is that more likely, or is it more likely that

9    Mr. Zaragoza's recantation, Mr. Sierra's affidavit, the

10   testimony -- and I didn't even mention the affidavit from

11   his sister -- but the testimony from his mother and

12   sister saying he was home, is it more likely that that's

13   true here, or that the State's case which rests entirely

14   on Detective Guevara's police work is true?

15            That's what the court's got to consider.

16   Mr. Rodriguez has met his burden.  It would be wrong for

17   this court to continue to maintain Mr. Rodriguez not

18   being declared innocent because of the detective work

19   Detective Guevara and Detective Halvorsen did.

20            It's an important decision for this court

21   to make.  It's not a hard one.  This court should grant

22   Mr. Rodriguez's certificate of innocence.

23      MR. HORVATH:  Judge, could I correct the record?  I

24   want to make sure the record is clear.
```

1          THE COURT:  Uh-huh.

2          MR. HORVATH:   Exhibit 2 of Ricardo Sierra,

3     paragraph 5, I'm going to read the whole thing.  Your

4     Honor can certainly read along with me.  I'm going to

5     read the whole thing so we're real clear.

6               Paragraph 5:  "I don't remember the date

7     that Rodney got shot, but I was there.  It was night

8     time.  I had bought him a six-pack of beer.  I bought

9     another six-pack for my father.  Me and the other guys in

10    the neighborhood had pitched in to buy everyone a

11    football pizza.  He ate the pizza on the block.  Everyone

12    ate fast but Rodney waited while we ate.

13         THE COURT:   Everyone ate first.

14         MR. HORVATH:  Excuse me, excuse me.  Thank you,

15    Judge.  "Everyone ate first but Rodney waited while we

16    ate.  I snatched some slices out for him.  I ran back to

17    my house to warm up some in the microwave."  He then

18    recants that he's walking back down and sees the

19    shooting.

20              Judge, Rodney is who he is coming to bring

21    pizza.  Rodney was in front of 1604.  But there is no

22    testimony in the record, none whatsoever, that there is a

23    block party in front of 1604.  None, none whatsoever.

24              That's the first thing anyone has heard of

                              72

1      it, and it contradicts Aurelio Martinez's statement that

2      while he was out in front of 1604 with Rodney, his friend

3      that got shot, apparently everyone is friends with Rodney

4      now, but we know where Aurelio Martinez was, when he was

5      there talking to Rodney when Rodney gets shot, the only

6      person he sees in the area, that's the word that he used

7      that testifies to, in the area, is Rudy.

8                    He didn't say a block party.  There wasn't

9      a block party, not in front of 1604.

10                   I just want to make the record real clear

11     on that.

12          THE COURT:  This is your copy.

13          MR. HORVATH:    Thank you, sir.

14          MS. THOMPSON:  I've said enough, your Honor.

15          THE COURT:  Okay.  All right.  Well, thank you very

16     much for a very interesting argument on this Friday

17     morning.  I'll take the matter under advisement, take a

18     look at the affidavits and consider the arguments.  Very

19     interesting argument from each of you.

20                   I know that you had indicated that you

21     were available, I think, the 13th of December, did you

22     say?

23                   (A discussion was held

24                    off the record.)

73

```
1          THE COURT:  13th of December.

2          MR. HORVATH:    Thank you.

3          THE COURT:  Okay.  Thank you, all.

4          MS. MYERSCOUGH-MUELLER:  Thank you, your Honor.

5          MS. THOMPSON:    Thank you, Judge.

6                          (WHEREUPON, the hearing in the

7                           above-entitled cause was continued to

8                           December 13, 2019.)

9

10

11

12                              *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1      STATE OF ILLINOIS  )
                           )  SS:
 2      COUNTY OF C O O K  )

 3

 4                   I, Susan M. Sychta, do hereby certify that I

 5      am a Certified Shorthand Reporter doing business in the

 6      City of Chicago; that I reported in shorthand the

 7      proceedings at the hearing in the above-entitled cause;

 8      that I further reduced said shorthand to typewriting, and

 9      that this transcript is a true and accurate record of my

10      shorthand notes so taken at said hearing before Judge

11      Leroy K. Martin, Judge of said court, on the 22nd day of

12      November, A.D. 2019, and contains all of the evidence had

13      and testimony taken on said date.

14

15

16

17

18

19

20                      _____

21                         Certified Shorthand Reporter

22                         CSR License No. 084-001178

23

24
```

75

```
                        Susan M. Sychta
                  Certified Shorthand Reporter
                        6922 29th Place
                       Berwyn, Il 60402

                       (773)304-7279
                   Ssychta613@gmail.com


     TO:  Austin Rahe
          (312)970-3474

     RE:  People versus Ricardo Rodriguez
          Case No. 96 CR 02723-01
          Hearing before Judge Leroy K. Martin, Jr.
          on November 22, 2019

     Original, 75 pages @ $4 p/p          $ 300.00
```

Exhibit 4

**Austin Rahe**

| | |
|---|---|
| **From:** | Tara Thompson <tara@loevy.com> |
| **Sent:** | Tuesday, January 7, 2020 7:11 PM |
| **To:** | Brueggen (External), David A.; Josh M. Engquist; Eileen E. Rosen; Austin Rahe; Theresa B. Carney; Catherine  M. Barber; Caroline P. Golden; Jim Daffada; Jeffrey R. Kivetz; Diamond M. Dixon; Thomas Leinenweber |
| **Cc:** | Russell Ainsworth |
| **Subject:** | Rodriguez v. Guevara, et al. |
| **Attachments:** | FERPA CONSENT  Rodriguez.docx; Coleman Proposed Protective Order.pdf |

Counsel:

We apologize for not conferring with you earlier about the motion that is up tomorrow.   Obviously we all want to move this case forward, so we are glad for an opportunity to do that.  Below is Plaintiff's view of the outstanding issues.

**Plaintiff's responses to Defendants' discovery requests -** Plaintiff recognize that these documents are outstanding, and we apologize for the delay.  Mr. Rodriguez has been out of state caring for some elderly relatives, but we recognize the need to get these done to move the case forward.  We are finalizing our responses now and will provide them by Friday.

**Defendants' Proposed FERPA Order -** Plaintiff can respond in writing, but we hope that Defendants will agree to a compromise -- the Defendants in the recent *Bouto* case agreed to this compromise -- which is that, with some minor modifications to the proposed order as reflected in the attached, Plaintiff agrees for Defendants to seek Plaintiff's Chicago Public Schools records through this device.  If there are other education institutions that Defendants wish to obtain records from, Plaintiff is happy to confer and get a modified release from Mr. Rodriguez if necessary.  Please let us know if that is acceptable.  If so, we will promptly get the attached proposed release signed by Mr. Rodriguez.

**Defendants' Proposed Protective Order -** While Plaintiff generally has no problem with the protective order proposed by Defendants, Plaintiff takes the same position it has in other cases (including Bouto) that this protective order should track the protective order entered in the Nevest Coleman case (attached) that makes a slight addendum to paragraph 6 to add language that:

All mental health information that is subpoenaed or requested from a covered entity shall be produced to RICARDO RODRIGUEZ'S attorneys for a privilege review to be conducted within three days of receipt. All documents produced to RICARDO RODRIGUEZ'S attorneys shall then be produced to the requesting party, excepting any documents over which privilege is asserted, which shall be identified on a privilege log.

***

It remains Plaintiff's view that because of the particular privileges that may attach to mental health records, including potential psychotherapist-patient privilege, these records should go to Plaintiff first for a privilege review so that any relevant privilege is not waived by production.  If Defendants can agree to that addendum to their proposal I think the parties are in agreement about the scope of this order.

**Scheduling Depositions -** Obviously it is fair for Defendants to want to see Plaintiff's discovery responses before moving forward with depositions, but we should confer and start setting a schedule - Plaintiff previously provided a notice of the depositions he wants to take, and we assume Defendants has others, so let's set up a

time to talk about that.  Let us know if there are any times on Friday or early next week we can set up a call to talk about scheduling.

Russell Ainsworth will be in court in the morning for Plaintiff if we need to talk further before stepping up.

Thanks,

Tara

_____
Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor
Chicago, Illinois  60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com
pronouns:  she, her, hers

Exhibit 5

# LOEVY & LOEVY

311 N. Aberdeen St., 3rd Floor, Chicago, Illinois 60607

February 5, 2020

**Via Electronic Mail**
Josh Engquist
The Sotos Law Firm, P.C.
141 W. Jackson, Suite 1240A
Chicago, Illinois  60604

Eileen E. Rosen
Stacy A. Benjamin
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly, LLC
312 N. Clark, Suite 2200
Chicago, IL 60654

James V. Daffada
Thomas M. Leinenweber
Kevin E. Zibolski
Justin L. Leinenweber
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, IL 60602

  *Re:* *Rodriguez v. City of Chicago*, Case No. 18 CV 7951

Counsel:

  Josh, we have received your notice of deposition for Mr. Rodriguez's deposition.  We are happy to produce him at a date convenient to the parties after Plaintiff has had a chance to confer with his counsel and prepare for the deposition.  Please provide us with dates in late February or early March that would work for Defendants for the deposition and we will get it scheduled.

  As you know, Mr. Rodriguez is a citizen of Mexico, and would like the support of the Mexican Consulate's Office for his deposition.  For that reason, we propose producing him for his deposition at the Mexican Consulate Office at 204 S. Ashland Avenue in Chicago.  The Consulate has a large conference room that is available for this purpose.  We trust that Defendants do not intend to use this civil litigation or their connection to law enforcement or the involvement of law enforcement as a way

of gaining tactical advantage in this litigation or in this deposition. If Defendants intend otherwise, please let us know so that we can discuss.

Finally, as Defendants know, we served notice of depositions upon Defendants back in September seeking to set dates for various depositions, including Defendants. We recognize that despite the pendency of that notice, Defendants appear to be seeking to depose Mr. Rodriguez first. We are happy to produce him as the first witness, but of course we can only agree to produce him if Defendants will provide dates for their depositions as well.

Sincerely,

*Tara Thompson*

Tara Thompson

cc:     Russell Ainsworth

Exhibit 6

**Austin Rahe**

| | |
|---|---|
| **From:** | Tara Thompson <tara@loevy.com> |
| **Sent:** | Monday, February 17, 2020 9:08 PM |
| **To:** | Josh M. Engquist |
| **Cc:** | Eileen E. Rosen; Caroline P. Golden; Catherine M. Barber; David A. Brueggen; Diamond M. Dixon; Jim Daffada (jim@ilesq.com); Jon Loevy; Kara Hutson; Monica Fuentes; Rachel Brady; Thomas Leinenweber (thomas@ilesq.com); Austin Rahe; justin@ilesq.com; kevin@ilesq.com; mjs@ilesq.com; russell@loevy.com; ruth@loevy.com; Theresa B. Carney |
| **Subject:** | Re: Rodriguez v. Guevara, et al - 18 CV 7951 | NOD |

Josh:

Defendants have articulated no prejudice to them to this deposition being conducted at the consulate's office - please let me know how that would prejudice Defendants. Plaintiff has articulated his reason for wanting the deposition at that location - it is not, as you insinuate, to gain some tactical advantage in this trial or to obstruct justice, but to facilitate the attendance of consular officers and to ensure that the deposition proceeds fairly.

Similarly, Defendants have articulated no reason for excluding consular officers from the deposition. Plaintiff is a Mexican national and has the right to consult with the consulate about legal matters in the United States. The Federal Rules of Civil Procedure do not bar such persons from depositions - to the contrary, the burden would be on Defendants to seek a protective order and articulate good cause for the exclusion of consular officers from the deposition. I invite you to review *Murphy v. United States*, 2017 WL 6379599 (D. N.M. Dec. 12, 2017) and the supporting caselaw from around the country cited therein which addresses the attendance of non-parties are federal depositions.

Finally, I note that Plaintiff remains willing to schedule this and other depositions in the case - you have yet to provide any proposed dates other than the initial date you noticed Plaintiff's deposition for that we promptly informed you did not work for Plaintiff and his counsel. When you provide additional dates we will be happy to work on scheduling while we work out the location details.

Thanks,

Tara

On Mon, Feb 17, 2020 at 4:25 PM Josh M. Engquist <JEngquist@jsotoslaw.com> wrote:
Counsel:

Please explain to defendants why Plaintiff needs to or is allowed to obtain the advice and support of the Mexican consulate in this civil matter, and why he needs to obtain the advice and support of the Mexican consulate at the consulate and cannot do so in another location. Also, Defendants object to allowing anyone to be present at Plaintiff's deposition that is not a party or an attorney representing a party in this matter. Please provide us with any authority that allows a member of the Mexican consulate to be present at Plaintiff's deposition over Defendants' objections. Further, please advise what advice and support the Mexican consulate can provide Plaintiff at his deposition in this civil case. It is not clear to us what the Mexican consulate can provide to Plaintiff that his attorneys cannot provide, or why he cannot obtain this "advice and support" prior to his deposition. In addition, Plaintiff has articulated no reason why Plaintiff would be prejudiced if his deposition went forward at any of the locations

proposed by Defendants, especially when it has never been an issue in the past (other than Solache/Reyes who are not allowed to return to the country).

Instead, it seems to Defendants that it is Plaintiff that is using the location of Plaintiff's deposition as a tactical advantage in this litigation and in Plaintiff's outstanding warrant/criminal case so that he may avoid arrest to attempt to both continue to prosecute this case while also purposefully evading the police in his criminal case by using the attorneys on both sides of the aisle to do so.

Finally, although you may disagree, Defendants are prejudiced because Defendants' attorneys are not willing to risk their law licenses, ethical, moral, and legal obligations, and criminal liability to assist Plaintiff in evading a felony warrant.

Sincerely,

Josh Engquist

(630) 735-3303

| | |
|---|---|
| **From:** | Tara Thompson <tara@loevy.com> |
| **Sent:** | Monday, February 17, 2020 1:52 PM |
| **To:** | Josh M. Engquist |
| **Cc:** | Diamond M. Dixon; Austin Rahe; Caroline P. Golden; Kara Hutson; Catherine M. Barber; justin@ilesq.com; Jim Daffada (jim@ilesq.com); kevin@ilesq.com; Thomas Leinenweber (thomas@ilesq.com); Theresa B. Carney; mjs@ilesq.com; Eileen E. Rosen; David A. Brueggen; russell@loevy.com; ruth@loevy.com; Monica Fuentes; Jon Loevy; Rachel Brady |
| **Subject:** | Re: Rodriguez v. Guevara, et al - 18 CV 7951 | NOD |

Counsel:

Thanks for your response. The issue is pretty straightforward to Plaintiff - we proposed to conduct his deposition at the office of the consulate so that he can receive the advice and support of that office during his deposition, and Defendants haven't articulated why this location would present a burden to Defendants given that the consular office is right in Chicago. Obviously all of us are officers of the court and are well aware of our ethical and legal obligations in this case, but it remains unclear to Plaintiff, even under the statute you cited, why any party's legal or ethical obligations would be at risk were Mr. Rodriguez's deposition to proceed at the consulate. It remains Plaintiff's position, as I said in my correspondence, that it would be inappropriate

2

for Defendants to use Plaintiff's pending warrant or their connection to law enforcement as a way of gaining tactical advantage in this litigation. That being said, Plaintiff's counsel intends to produce Plaintiff for his deposition in this matter, and if Defendants want to propose dates for his deposition, we can get it scheduled and resolve the specific location in Chicago as we move forward.

Best,

Tara

On Mon, Feb 17, 2020 at 1:39 PM Josh M. Engquist <JEngquist@jsotoslaw.com> wrote:

Counsel:

We write in response to your February 5, 2020 correspondence which proposes that Plaintiff's deposition proceed at the Mexican Consulate. Frist, we are surprised that after our, and the Court's, repeated attempts to have you answer the simple question of when your client is going to resolve his arrest warrant, that this is the response we receive. As officers of the Court, it is unclear to us how you can be so flippant in ignoring a judicial mandate to have your client taken into custody for aggravated kidnaping. Second, we (as I have done on several other occasions in other litigation over the years) made sure you were aware of your client's legal issue so that it could be resolved prior to his deposition. Our goal in informing you of your client's status, was not to seek any tactical advantage in the litigation or at the deposition. To be clear, we informed you of your client's status because we believe it is an obstacle to Plaintiff's ability to prosecute his lawsuit because his fugitive status places him beyond judicial control.

Your request to choose a later date can, of course, be worked out among the parties. However, we are insistent that the deposition of Mr. Rodriguez will have to take place at either my office or at Rock Fusco & Connelly. We cannot agree to your proposal that his deposition take place at the Mexican Consulate. In fact, your proposal that the deposition take place at the Mexican Consulate only reinforces our belief that his fugitive status places him beyond judicial control. Additionally, we as officers of the Court, cannot be complicit in concealing or aiding Plaintiff in violation of State law as you have requested. (720 ILCS 5/31-5).

As for the depositions you noticed, as you are aware, you noticed a series of 14 depositions at the same time you issued initial discovery. It would be disingenuous for you to assert that you actually intended any of these depositions to go forward as noticed. It was an obvious attempt to call "mine" on all of the depositions. Moreover, based upon the date of the warrant, your client was already in hiding from authorities at the time you issued these. Certainly, if you were aware of your client's fugitive status at the time that you served the deposition notices and discovery, it was you, not Defendants, attempting to seek a tactical advantage. Regardless, as you are aware, the reason discovery has been delayed is because your client was unable or unwilling to respond to written discovery while he remained in hiding.

3

Defendants should not be forced to expend time and resources on discovery while your client remains a fugitive, is unwilling to cooperate with discovery in any way less than having all the attorneys on this case conceal him from a valid arrest warrant and, apparently insists on maintaining his fugitive status thereby remaining beyond judicial control.

Please inform us whether your client intends to resolve his warrant issue and when.

Sincerely,

Josh Engquist

(630) 735-3303

**From:** Tara Thompson <tara@loevy.com>
**Sent:** Wednesday, February 5, 2020 9:45 PM
**To:** Diamond M. Dixon <DDixon@jsotoslaw.com>; Josh M. Engquist <JEngquist@jsotoslaw.com>; arahe@rfclaw.com; Caroline P. Golden <CGolden@jsotoslaw.com>; Kara Hutson (khutson@rfclaw.com) <khutson@rfclaw.com>; Catherine M. Barber (cbarber@rfclaw.com) <cbarber@rfclaw.com>; justin@ilesq.com; Jim Daffada (jim@ilesq.com) <jim@ilesq.com>; kevin@ilesq.com; Thomas Leinenweber (thomas@ilesq.com) <thomas@ilesq.com>; tcarney@rfclaw.com; mjs@ilesq.com; 'Eileen E. Rosen' (erosen@rfclaw.com) <erosen@rfclaw.com>; David A. Brueggen <DBrueggen@jsotoslaw.com>
**Cc:** russell@loevy.com; ruth@loevy.com; Monica Fuentes <monica@loevy.com>; Jon Loevy <jon@loevy.com> **Subject:** Re: Rodriguez v. Guevara, et al - 18 CV 7951 | NOD

Counsel:

Please see the attached correspondence related to the deposition notice for Mr. Rodriguez.

Best,

Tara Thompson

On Tue, Jan 28, 2020 at 5:01 PM Diamond M. Dixon <DDixon@jsotoslaw.com> wrote:

Dear Counsel,


On behalf of Individual Defendants' counsel, Josh M. Engquist, attached please find a notice of deposition for Ricardo Rodriguez.


Thank you.


**Diamond M. Dixon**

**Paralegal**


THE SOTOS LAW FIRM, P.C.

141 W. JACKSON, SUITE 1240A

CHICAGO, IL 60604

Direct Line: (630) 735-3309

Fax: (630) 773-0980

🌍 Save a Tree - Think Before You Print


This e-mail, including attachments, is covered by the *Electronic Communications Privacy Act*, 18 U.S.C. 2510–2521. It contains information that is confidential and it may be protected by the attorney/client or other privileges. This e-mail, including attachments, constitutes non-public information intended to be conveyed only to the designated recipients. If you are not an intended recipient, please delete the e-mail, including attachments, and notify sender by mail, e-mail, or at 630-735-3300. The unauthorized use, dissemination, distribution or reproduction of this e-mail, including attachments, is prohibited and may be unlawful.

--

Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor

Chicago, Illinois 60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com

pronouns: she, her, hers


--

Tara Thompson
Loevy & Loevy
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
tara@loevy.com
pronouns - she/her (why does this matter?)

6