1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   RICARDO RODRIGUEZ,                )  No. 18 C 7951
                                       )
 4                  Plaintiff,         )
                                       )
 5            vs.                      )  Chicago, Illinois
                                       )
 6   CHICAGO POLICE OFFICERS REYNALDO  )
     GUEVARA, ERNEST HALVORSEN, RICHARD)
 7   CURLEY, ROBERT BIEBEL, ED MINGEY, )
     LEE EPPLEN, M. SANDERS, J. MOHAN, )
 8   and UNKNOWN OFFICERS, and the CITY)
     OF CHICAGO,                       )
 9                                     )  May 3, 2022
                    Defendants.        )  10:31 a.m.
10
                     TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HON. SUSAN E. COX, MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiff:    MS. RACHEL E. BRADY
                           Loevy & Loevy,
14                         311 North Aberdeen Street, 3rd Floor,
                           Chicago, Illinois  60607
15
     For Defendant
16   Reynaldo Guevara:     MR. THOMAS MORE LEINENWEBER
                           MS. MEGAN K. McGRATH
17                         Leinenweber, Baroni & Daffada, LLC,
                           120 North LaSalle Street, Suite 2000,
18                         Chicago, Illinois  60602

19   For all Individual
     Defendants:           MR. JOSH M. ENGQUIST
20                         The Sotos Law Firm, P.C.,
                           141 West Jackson Boulevard, Suite 1240A,
21                         Chicago, Illinois  60604

22   For Defendant
     City of Chicago:      MS. EILEEN E. ROSEN
23                         Rock, Fusco & Connelly, LLC,
                           321 North Clark Street, Suite 2200,
24                         Chicago, Illinois  60654

25          Patrick J. Mullen, Official Court Reporter
     219 South Dearborn Street, Room 1412, Chicago, Illinois 60604
```

1          (Proceedings in open court on the record.)

2              THE COURT:  Good morning, everyone.  Have a seat.

3          (Brief pause.)

4              THE COURT:  I'm going to ask that you keep your masks

5      on when you are not talking, if that's okay with you.

6              So thank you for your reports regarding the

7      outstanding discovery issues and getting them to me as

8      expeditiously as you did.  Does either side or any party have

9      anything they would like to add to the record?  Plaintiff?

10             MS. BRADY:  The only thing, Your Honor, that I

11     realized when I was reading defendants' report is I'm learning

12     now that they're attempting to mischaracterize this situation

13     as a lack of diligence on our part.  The only thing I want to

14     say about that -- and I will not belabor what's in our

15     report -- is that there were pieces of this Curley GPR missing

16     from the defense file that we've been pursuing throughout

17     discovery, and the fact that there were elements of this that

18     were raised throughout discovery, we needed Judge Ramos'

19     deposition to tie it all together, which is why it happened.

20             THE COURT:  Yes, and you waited until after the close

21     of discovery to take it.

22             By the way, I should have before we started had all of

23     you enter your appearances.  Look at how out of practice we

24     are.

25         (Laughter.)

1          THE COURT:  I mean, it's just that this is the first

2    in-person discovery hearing I've had since 2020.  So

3    congratulations.

4          Go ahead and say your name, please, and then you guys

5    do the same.

6          MS. BRADY:  Good morning, everyone.  This is Rachel

7    Brady on behalf of the plaintiff.

8          THE COURT:  Good morning.

9          MS. ROSEN:  Eileen Rosen on behalf of defendant City

10   of Chicago, and I'll say on my behalf this is the first hearing

11   I've had since 2020.

12         THE COURT:  Well, welcome.

13         MS. ROSEN:  So it's nice to see you in person.

14         THE COURT:  We aren't going to have very many, but it

15   seemed to me that this one should be in person.  So go ahead.

16         MR. ENGQUIST:  Josh Engquist on behalf of Halvorsen,

17   Curley, Biebel, Mingey, Epplen, and Sanders.

18         THE COURT:  All right.

19         MS. McGRATH:  Good morning.  Megan McGrath on behalf

20   of defendant Guevara.

21         THE COURT:  Okay.  So you were saying that it wasn't

22   until Judge Ramos' deposition that you really became aware of

23   the true nature of this file.  But again, that deposition took

24   place by agreement after I closed discovery over objection.

25         MS. BRADY:  I believe, Your Honor, not that this

1    matters very much, but the deposition took place on the last

2    day of discovery.  I mean, I --

3            THE COURT:  I mean, really, in all honesty, it doesn't

4    make really one wit of difference in terms of the larger point.

5    Anything else you'd like to raise?

6            MS. BRADY:  Yes.  So to that point, we didn't intend

7    to take Judge Ramos' deposition because we thought that this

8    homicide file issue had been clearly decided by this Court in

9    Bouto.  So we didn't think that we needed Judge Ramos'

10   deposition.  We thought we would be able to kind of piece

11   together the --

12           THE COURT:  That doesn't follow at all because in

13   that, in the decision on the protective order, I made it clear

14   that if you believed there was a, quote-unquote, Brady

15   violation -- which, by the way, I don't believe this is, and

16   I'll talk about that in a minute -- you were supposed to come

17   to me immediately and tell me.  So that doesn't wash, either.

18   Sorry.  Nice try, but no.

19           Anything you guys want to say?

20           MS. ROSEN:  No, Judge.  I think we made clear our

21   position in the papers, and it really just has to do in the

22   city's view with an attempt to bootstrap, you know, some

23   ambiguous testimony from Judge Ramos to get Monell homicide

24   file discovery that plaintiff did not pursue.

25           THE COURT:  Right.  But can you really say, Ms. Rosen,

1   with a straight face that you were unaware of the plaintiff's

2   desire to get these files which have been produced across the

3   board in the Guevara cases?

4           MS. ROSEN:  So what I can say is that, sure, but the

5   manner in which the files were produced across the board varied

6   case by case.

7           THE COURT:  Right.

8           MS. ROSEN:  And this case sat slightly differently due

9   to the one year or so delay because of Mr. Rodriguez's fugitive

10  status.  That sort of put the whole case on hold, and so the

11  other cases sort of progressed while this one did not while the

12  motion was pending.  Then Mr. Rodriguez got picked up, and then

13  the case started moving again.

14          There were discussions.  I certainly do not deny that

15  I had discussions with Mr. Ainsworth specifically about

16  homicide files and, in fact, he reached out to me after this

17  Court issued a ruling on, I believe, not the city's protective

18  order, but the run-of-the-mill model protective order where

19  there was a dispute.  You cautioned the parties that you had

20  ruled and that we should understand your position on that.

21          So Mr. Ainsworth reached out to me and suggested that

22  this Court had ruled in Bouto that five years was appropriate.

23  This was at the time the Rule 72 objection was pending, and he

24  proposed the same thing but added the caveat that the city had

25  to stipulate that that was a statistically significant sample.

1       THE COURT:  Right, I recall that.

2       MS. ROSEN:  Yeah.  And so the city has never done

3  that.  No court has ordered the city to do that.  Then the

4  discussions ended.  Then in September, I believe, of 2021,

5  Ms. Brady reached out by email and asked what we were going to

6  do with the homicide files and did we have a final position,

7  and at that point we had already had a hearing in front of this

8  Court on the city's motion for a protective order where you

9  indicated you were seriously considering reconsidering

10  bifurcation.

11       THE COURT:  Right.

12       MS. ROSEN:  So I suggested that we table the

13  discussion till we got your ruling, which we did in November of

14  2021, and plaintiff never came back to the city to say:  I want

15  these files.

16       It wasn't until we got the discovery in the end of

17  February, the written discovery, that we had gotten across all

18  the cases asking for a request to admit and things like that

19  about the city's policy as it relates to the homicide files,

20  which prompted me to reach out to plaintiff to say, you know,

21  we have had discussions and we produced the CR files.  Like

22  that happened, and there was no discussion about homicide

23  files.  It's a lot of work to pursue that claim.  So if I

24  hadn't heard from them, I said:  I was under the understanding

25  you weren't pursuing it.

1      That was at the -- by the time we had that discussion,

2  it's mid-March or late March and discovery is closing.  Then

3  that --

4      THE COURT:  Discovery actually closed, I think, in

5  February, February 28th.

6      Am I wrong about that, Mike?  I might have that

7  screwed up in my head.

8    (Discussion off the record.)

9      MS. ROSEN:  Yeah, I think it might have been March

10  29th.  But regardless, this was happening right at the end, and

11  it was at that point that Ms. Brady told me that, no, I had

12  agreed to five years worth of homicide files.  So I said:

13  Okay.  Well, show me where I agreed.  I mean, I'm dealing with

14  a lot of these cases across the board.  I could have forgotten.

15      She couldn't show me where I did, and then she flipped

16  her position to:  Well, we'll just use the Reyes files.

17      THE COURT:  Which have been produced.

18      MS. ROSEN:  Yes, the Reyes files have been produced.

19  That's correct.

20      THE COURT:  So is it fair to say that there's

21  virtually no real burden on the city if they were to be ordered

22  to be produced here?

23      MS. ROSEN:  There's no burden in terms of the fact

24  discovery.

25      THE COURT:  Right.

1          MS. ROSEN:  There's a burden as it relates to what's

2    going to happen once we get to the expert phase, because as we

3    now know the homicide file expert discovery in Solace-Reyes,

4    because of the way the experts have dealt with the files has

5    now created another six-month delay in Solace-Reyes to complete

6    expert discovery.

7          So, yes, I mean, it's easy enough for the city to

8    simply Bates stamp those files or designate them, and then we

9    can issue our contention interrogatories and whatever written

10   discovery we have around those files.

11         THE COURT:  Why would you need to do that?  Fact

12   discovery is closed.

13         MS. ROSEN:  Well, so when we have the homicide files,

14   then the next step for the city is typically, okay, to identify

15   from these files every Brady allegation, every allegation of

16   fabrication, and that's typically how the city begins its

17   defense on the homicide files once we get to the expert phase.

18   So because the city did not know that plaintiff wanted the

19   homicide files or intended to use them, we didn't issue that

20   discovery because we thought it was a dead issue.

21         THE COURT:  Are you saying that that discovery would

22   be issued as part of expert discovery or as part of fact

23   discovery?

24         MS. ROSEN:  It has historically been done as part of

25   fact discovery.

1          THE COURT:  But there's no reason why.  What you're

2   really saying is that your expert -- and I assume you have the

3   same expert across the board in these cases or set of experts,

4   is that right?

5          MS. ROSEN:  Typically, yes.

6          THE COURT:  Yes.

7          MS. ROSEN:  Yes.

8          THE COURT:  So, I mean, to that extent, it just seems

9   to me that there would be a clear overlap in effort, but I'll

10  get to that in a minute.

11         Mr. Leinenweber, is that you behind that mask?

12         MR. LEINENWEBER:  Good morning, Your Honor.

13         THE COURT:  Good morning.

14         MR. LEINENWEBER:  Nice to see, Your Honor.

15         THE COURT:  Go ahead and enter your appearance,

16  please.

17         MR. LEINENWEBER:  Good morning, Judge.  Tom

18  Leinenweber also on behalf of defendant Reynaldo Guevara.

19         THE CLERK:  Can you speak closer to a mike?

20         THE COURT:  Yes, and also keep your mask up while

21  speaking.

22         MR. LEINENWEBER:  No problem.

23         Good morning, Judge.  Tom Leinenweber also appearing

24  on behalf of defendant Reynaldo Guevara.

25         THE COURT:  Good morning.

1    So anything else anybody wants to say?

2    MS. BRADY:  Can I speak briefly to that, Your Honor?

3    THE COURT:  Sure, of course.

4    MS. BRADY:  After the initial rounds of

5    meet-and-confers about the homicide files, we tried for three

6    months to get the city to give us its position.  So to the

7    extent the city is suggesting that they weren't aware we were

8    pursuing this, we tried for months and the city has had a

9    lengthy gap in between when they agreed to do something and

10   when they actually produced the CR files.  It took four months

11   for us to get them.

12   THE COURT:  Okay.  And yet you knew and at all times

13   you knew that had you brought a motion to compel regarding a

14   subset of the homicide files that it most certainly would have

15   been granted, correct?

16   MS. BRADY:  Yes, Judge.

17   THE COURT:  But you did not.  At any point, you did

18   not.  So you say you didn't get a position from the city.

19   Okay.  Maybe you didn't.  Maybe you did.  I don't know, and I'm

20   certainly not going to read the 5,000 emails you guys probably

21   wrote on this issue.

22   But, in fact, your firm on behalf of the plaintiffs in

23   these cases has never been shy about coming to this Court and

24   requesting relief when you truly believed that you needed

25   something and the city wasn't producing it.  Is that a fair

1   assessment?

2           MS. BRADY:  Yes.

3           THE COURT:  Okay.

4           MS. BRADY:  But --

5           THE COURT:  But what?

6           MS. BRADY:  Honestly, to be totally frank, Your Honor,

7   this is the first of these cases that I'm leading myself.

8           THE COURT:  Understood.

9           MS. BRADY:  I know that this Court has admonished us

10  not to file things, and so honestly I --

11          THE COURT:  You know, don't you even start to put it

12  back on me.  That is the very definition of a dead end.  I have

13  seen motion to compel after motion to compel, motions for

14  protective orders throughout both this case and Bouto.  So the

15  fact that, you know, I've urged as the rules require that the

16  parties meet and confer and try to work things out should never

17  have been construed, nor do I think you really did construe it

18  as an admonition that you shouldn't file a motion to compel.

19          MS. BRADY:  Sure.

20          THE COURT:  I'm not buying that.

21          MS. BRADY:  Sure, and I did mean to suggest that the

22  Court admonished us not to file a motion.  But I thought that

23  the Court's ruling in Bouto made it clear and that a motion

24  wasn't necessary, and I did not want to burden the Court with a

25  duplicative filing.

1      THE COURT:  Right.  But when you don't, when you don't

2  get something that you think has been ordered, you take the

3  appropriate steps, and that didn't happen here.  I mean, I

4  think the record is really clear.  I mean, I have -- so here's

5  the thing.  I think the plaintiff has been aware of this issue

6  with what we're calling the Curley GPR.

7      By the way, what does "GPR" stand for?

8      MS. ROSEN:  General progress report.

9      THE COURT:  All right.  I think it's clear that you

10  were aware of this issue since early on in this case.  I don't

11  think any of this has been a surprise to the plaintiff, and I'm

12  baffled as to why if you believed truly that this is a

13  violation of your client's constitutional rights that's

14  actionable that you would have waited until either the last day

15  of discovery or after discovery -- and I don't know which -- to

16  take a deposition which now you claim to be essentially the

17  most important evidence on this point.  That doesn't, that

18  doesn't compute for me.

19      Now, I don't think, I don't think this file is Brady

20  material for all kinds of reasons.  Even assuming that the file

21  wasn't turned over to the defense -- and by the way, we have no

22  way of knowing that.  There is no way either I, you, the

23  defense parties, or a potential jury is ever going to be able

24  to know that because the defense file, as I understand it, has

25  been destroyed.  So what we are left with is Ms. Ramos'

1   testimony which can be read different ways, that compounded by

2   the fact that the state's attorney's file includes this

3   material.

4          Again, the facts on this are very -- in my mind are

5   very, very gray.  Ultimately it won't be my call, but the idea

6   that this definitively establishes a violation of

7   constitutional rights -- by the way, it's not Brady.  This

8   isn't exonerating material.  It's Giglio.  The best thing that

9   could happen here is that had Ms. Ramos -- hypothetically, if

10  she had not had this file or if she had the file, she would

11  have simply cross-examined the witness about his failure to

12  identify your client on an earlier occasion.  Then the jury

13  would do with that information what they always do with

14  impeaching information.  Either it would be very important to

15  them or it wouldn't be.  We have no way of knowing.

16         So whether this is a constitutional violation or not,

17  I don't know, but if it is it's a Giglio violation, not a Brady

18  violation, because there's nothing about that that exonerates

19  your client, which is what Brady is about.  Okay?

20         By the way, just because something was turned over to

21  the prosecutor, if it wasn't turned over to the defense, it's

22  still potentially a constitutional violation.  The problem is

23  the record here.  It's not conclusive in any way, shape, or

24  form.

25         I don't buy fundamentally the notion that anything

1    that happened with this particular report suddenly made the

2    need for homicide files apparent to the plaintiff.  I think

3    what really happened here -- and I say this respectfully, Ms.

4    Brady -- is your firm dropped the ball on this.  There are a

5    lot of cases, there have been a lot of rulings, and you just

6    didn't pursue this.

7         So now in my mind what I find difficult is you are

8    trying to after the fact justify sort of negligence in terms of

9    obtaining these files which have been produced in every one of

10   these Guevara cases by trying to retrofit this excuse as:  Oh,

11   the dawn has broke.  Now we know we need them.

12        You've known for some time that you wanted these

13   files.  You just didn't pursue them.  I would be a lot more

14   impressed with your papers if you had actually come out and

15   said:  Look, we messed up.  We didn't follow up.  We should

16   have, but it's unfair to penalize our client for our mistake in

17   not filing a motion to compel and getting what you have ruled

18   relevant, you know, across the -- what every judge in this

19   district has ruled as relevant across the board.

20        I just -- this is not a -- the existence of this file

21   does nothing in my mind to make these more or less relevant,

22   and if it did, it did a long time ago and it's still basically

23   you didn't do anything.  The problem I have, I agree with the

24   city that this is a pretext and I agree with the city that you

25   didn't do what you should have done, but the problem I have is

1     Mr. Rodriguez, the client here.

2          If I don't give them access to some of these files, he

3     will be the only plaintiff across the board in the Guevara

4     cases that will not have access to some part of this discovery,

5     and the only reason that happened is that his law firm didn't

6     follow up with you.  You knew, I think, throughout this period

7     that they wanted these files, and you kind of just sat on your

8     hands, which I guess is a tactic but not one I particularly

9     like because you knew that I would -- if it came to me, that I

10    would say, sure, you could have a certain number of years of

11    files.

12         So I kind of feel sandbagged by both sides, to tell

13    you the truth, and all of this is happening after the close of

14    discovery.  By the way, you know, you may have a lot of

15    negotiations going about the telephone calls and about other,

16    you know, things that happened in depositions.  As far as I'm

17    concerned, everything you did after I closed discovery over

18    objection is on you.  The Court has no role in that.  You've

19    operated by agreement, and you continued to operate by

20    agreement, which means if somebody doesn't want to do something

21    that's on you because you all waited to the end to do stuff

22    which now you think is very important, and that's not on me.

23         How long has discovery been going on in this case?

24    Even with the delay you're talking about, Ms. Rosen, we're

25    talking years of discovery.  So be clear that those disputes

1    that you may or may not have, don't bring them here because

2    they're not my concern.  You made an agreement to take

3    discovery outside of the cutoff.  That's your issue and your

4    problem if it doesn't work out to your liking, not mine.

5           So the end result here is I'm going to give the

6    plaintiff these three years of files because I don't see the

7    burden or prejudice to the city, the three years in the Reyes

8    case, and that's it.  If there is follow-up discovery that

9    needs to be done, it can be done as part of expert discovery

10   because, in fact, what you're really saying is that's why you

11   would need to do it.

12          Since you're already -- since you've already analyzed

13   these files because they've been produced in other litigation

14   and they've been produced essentially on the same kinds of

15   Monell issues that are raised here, I'm not really seeing -- it

16   strikes me as a little bit incredible to think that the city

17   hasn't actually figured out or tried to figure out whether

18   there's a Brady or Giglio violation in these materials since

19   they've been produced across cases, right?

20          So I don't see the burden, but I have to say the only

21   reason I'm doing this is to protect Mr. Rodriguez's rights

22   because I don't think it's fair to punish him for the fact that

23   you did not do what you should have done.  That's the only way

24   I can read these papers, and I would suggest in the future when

25   you drop the ball on something you just say:  I dropped the

1   ball.

2         People do.  It happens.  These cases are complex.

3   They're over many years.  There's lots of them.  I understand

4   why that might have happened, but I don't believe that the

5   appropriate thing to do is to try to find and, as I say,

6   retrofit an excuse to cover the fact that you just did not

7   pursue files that now you really think you should have.

8         Any comments, concerns, thoughts?

9         MS. ROSEN:  Just from the city's perspective, Judge,

10  it was not apparent to me in this case that plaintiff was

11  pursuing the homicide files because there were numerous

12  discussions about lots of other discovery and it never came up.

13  So while CR files were brought up, hundreds and hundreds of

14  those, homicide files were not.  Everybody makes strategic

15  decisions about how to pursue cases, and just in a couple of

16  the cases we have not produced homicide files because the cases

17  were bifurcated on the front end.

18        THE COURT:  Right, which this case was not.

19        MS. ROSEN:  This case was not.  And, you know, we have

20  -- you know, part of my calculation in terms of what was in

21  play quite honestly has to do with our evaluation of the

22  strength of Mr. Rodriguez's case.  If we evaluate the cases --

23  oops, sorry -- if we evaluate the Guevara cases across the

24  board, I have to say in all honesty Mr. Rodriguez's does not

25  strike us as one that has an enormous amount of strength, so it

1    would make sense to me that a plaintiff might not want to

2    invest.  So that's my calculation, just to explain to the Court

3    that I wasn't lying in wait for plaintiff to drop the ball.

4            THE COURT:  Okay.

5            MS. ROSEN:  And quite frankly, had Ms. Brady at the

6    end of all this said to me "we dropped the ball, so is there

7    something we could do," this would have gone a different way.

8    It was the attempt to put it back on us and to then try and

9    recreate a story that was not the story that played out.

10           THE COURT:  Well, I have to say that's my view of it,

11   too, but that doesn't change the fact that if I deny this

12   request the person I am really potentially penalizing is

13   Mr. Rodriguez and none of this is his fault.  Frankly, given

14   the relative lack of burden on the city with respect to these

15   three years that have already been produced and, I'm guessing,

16   pretty heavily analyzed, I don't feel like I can in good

17   conscience penalize him in that way.

18           But I will reiterate that the best way to get what you

19   want is not to try to come up with an excuse that really

20   doesn't hold water under any serious analysis.  It's to just

21   come in and say:  Do you know what?  We should have filed a

22   motion, and we didn't.

23           You know, I don't know what Ms. Rosen would have done

24   with that and the other parties or not, but I have to say I

25   find that a lot easier to deal with than this.  By the way, you

1     know, none of this is free.  I mean, both sides wrote extensive

2     position papers, and I just think it was completely a waste of

3     time.  I mean, that's where I come out on this.  So you will

4     produce the files.

5             MS. ROSEN:  Can I just get a clarifying question?

6             THE COURT:  Sure, yes.

7             MS. ROSEN:  You're saying produce the Reyes files.

8             THE COURT:  The Reyes files, the three years.

9             MS. ROSEN:  All right.  So that's actually four years

10    because it's '95, '96, '97, and '98.

11            THE COURT:  Okay.  All right, four years.

12            MS. ROSEN:  I just wanted to make sure.

13            THE COURT:  I apologize.

14            MS. ROSEN:  No, no worries.

15            THE COURT:  Obviously I have trouble counting.

16            MS. ROSEN:  No.  I most of the time do, too.

17            THE COURT:  Well, like I say, if I could do math, I

18    probably would be in a different job.  But, yes, as I said,

19    you're not going to do follow-up fact discovery, but if there

20    are, I think you could fairly raise some of these issues in

21    terms of your expert analysis.  Like I said, I think your

22    expert has probably looked at this already because this issue

23    is cropping up in cases across the board.

24            So, you know, I do want to be clear.  The only reason

25    I'm granting your request, plaintiff, is so your client is not

 1  penalized and is not treated differently than the other Guevara
 2  plaintiffs, not because I think the Curley GPR materially
 3  changed anything between the parties because I most assuredly
 4  do not.  Okay?
 5       So what I need from you guys and what Judge Rowland
 6  needs is an order, an agreed order, if possible -- if not, I'll
 7  do it -- for expert discovery.  She wants it.  It's clear that
 8  you don't want to do dispositive motions before expert
 9  discovery.  That's a choice.  You know, I'm okay with that.
10  She wanted to know.  When you have that, I'll enter it and
11  you'll proceed.
12       I would really like you guys to think about exactly
13  how you're going to spend that time because we're going to have
14  an expert discovery period and we're not going to extend it
15  five times.  It's going to be what it is.  So build into your
16  thought process, both sides, what you really need to do and how
17  long, given everything that's going on in the world and
18  everything that's going in your other cases and everything,
19  period, build in enough time to do the jobs that your clients
20  need you to do.  Okay?  I'd much rather have a realistic
21  schedule which we can all abide by than, you know, constant
22  fights about extending it or not extending it.
23       As I said, with respect to the other issues that may
24  or may not be percolating between the parties regarding fact
25  discovery after the close of discovery, that's your ballgame,

1    not mine.  So I suggest since you both want different things

2    from each other that you work it out.  All right?

3            MS. ROSEN:  Understood, Judge.

4            THE COURT:  Okay.  Thank you, everyone.

5            MS. ROSEN:  Thanks, Judge.

6            MS. BRADY:  Thank you.

7            THE COURT:  Try to stay dry.

8            MS. ROSEN:  Nice seeing you.

9            THE COURT:  Nice seeing all of you.

10           MS. BRADY:  Nice seeing you.

11           THE COURT:  It's nice seeing all of you.  Actually,

12   it's nice putting on my robe.

13       (Proceedings concluded.)

14               C E R T I F I C A T E

15       I, Patrick J. Mullen, do hereby certify that the
     foregoing is an accurate transcript produced from an audio
16   recording of the proceedings had in the above-entitled case
     before the Honorable SUSAN E. COX, one of the magistrate judges
17   of said court, at Chicago, Illinois, on May 3, 2020.

18                           */s/ Patrick J. Mullen*
                             Official Court Reporter
19                           United States District Court
                             Northern District of Illinois
20                           Eastern Division

21

22

23

24

25